2018 IL App (2d) 171034
No. 2-17-1034
Opinion filed November 20, 2018

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF CHERIE A. VERHINES, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Petitioner-Appellant, | ) ) | |
| and | ) ) | No. 05-D-2084 |
| MICHAEL J. HICKEY, | ) ) ) | Honorable Neal W. Cerne, |
| Respondent-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices Schostok and Spence concurred in the judgment and opinion.

**OPINION**

¶ 1    Respondent, Michael J. Hickey, petitioned for a reduction of child support under section 510 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/510 (West 2016)). Michael pleaded that an involuntary termination led to an early retirement and that, at age 64, he no longer earned the $180,000 net income upon which the support amount had been based. The court granted the petition, reducing the monthly support amount from $3043 to $1700. It determined Michael's net income under section 505 of the Act (*id.* § 505) to be $78,000 per year, with a guideline support amount of $1300 per month, and it issued an upward deviation of $400 due to Michael's wealth.

¶ 2    Petitioner, Cherie A. Verhines, appeals. She argues that, as a threshold matter, Michael's net income is far higher than $78,000. According to Cherie, the court forgot to include $83,000 in deferred compensation and erred in refusing to categorize any portion of a $400,000 withdrawal from a retirement account as section 505 income. Michael admits to having used $129,000 of this withdrawal to sustain his lifestyle. Plugging the correct numbers into the section 510 modification analysis, Cherie asserts that the court erred in reducing support. Further, Cherie continues, Michael's retirement did not lead to a substantial change in his economic fortune such that he should be relieved of his support obligation.

¶ 3    Generally, we agree with Cherie. Michael's net income is at least $128,000 per year, for a guideline support amount of $2133 per month. Regardless, income is not the only factor in a substantial-change analysis, and here there has not been a substantial change in Michael's overall financial position. Although retirement is generally equated with reduced means, a parent with a retirement as well-funded as Michael's ($2.585 million in brokerage accounts; three homes, including a $775,000 vacation residence; and a demonstrated travel budget of $60,000 per year) has not had a reversal of economic fortune such that he is entitled to be relieved of a $900-per-month shortfall between the new guideline amount and the original award. Rather, this case is unique in the sense that an obligor parent with significant means chose to have a child later in life. Thus, he necessarily retired at the tail end of the child's dependency. Though initially unwanted, the lack of employment and withdrawal of assets here represent not a hardship but, rather, a life stage. Michael, relieved of the responsibility of saving for retirement, is now situated to draw on his retirement accounts to finance his life in a planned-for manner. Part of his life is his minor child. Michael uses his retirement accounts to maintain a luxurious vacation residence and travel the world, so he can also use his retirement accounts to satisfy his

comparatively modest support obligation over his son's remaining years of dependency. Also, we note that the trial court misapplied the law when it considered only those costs exclusive to the child in determining the child's needs, it misstated the evidence when it assessed Cherie's financial resources, and it engaged in faulty logic when it assessed the impact that satisfying Michael's support obligation would have on his financial security in retirement. Accordingly, we reverse.

¶ 4                                    I. BACKGROUND

¶ 5     Michael, born in 1953, and Cherie, born in 1967, married in 2004. Their only child together, a son, M.H., was born later that year. Michael had another son from an earlier marriage, who was then approximately 14 years old. The parties separated in September 2005, and they were divorced in March 2007.

¶ 6     The March 2007 judgment of dissolution incorporated the parties' marital settlement agreement and parenting agreement. Both parties waived maintenance. Cherie was to have residential custody of M.H. Michael, who had grossed approximately $550,000 in 2006 as an executive for a packaging company, was to pay child support according to the following downward sliding scale:

| Amount Earned *Gross* | Percentage of *Net* | Amount Due |
| --- | --- | --- |
| $0-$250,000 | 20% | $2596/month guaranteed |
| $250,000-$350,000 | 15% | $10,800/year if applicable |
| $350,000-$450,000 | 10% | $6900/year if applicable |
| $450,000-$500,000 | 5% | $2700/year if applicable |
| $500,000-$600,000 | 5% | $5400/year if applicable |

Support from the last $100,000 bracket, representing $500,000 to $600,000 gross, would be deposited in a college fund.[1] No support would be given for amounts earned over $600,000.

---

[1] Any money remaining in the college fund upon M.H.'s graduation from college or at

Support would terminate at age 19 or upon graduation from high school, whichever occurred first. Support would also terminate if M.H. lived away from Cherie full time, such as in a boarding school, or if he married or joined the military.

¶ 7    In April 2009, Cherie petitioned to modify child support. She alleged numerous changed circumstances: (1) Michael's elder child had become emancipated, and Michael no longer paid child support for that child; (2) Michael's salary and bonuses increased; (3) M.H.'s expenses increased; and (4) Michael's visitation had been erratic, increasing daycare and other child-related costs and causing Cherie to miss opportunities, such as having to cancel a class in which she was enrolled.

¶ 8    Michael responded that Cherie "earns approximately $150,000 per year. The foregoing notwithstanding, [Cherie] s[eeks] an increase in child support." Subsequent discovery showed that at that time Cherie's salary was approximately $145,000 per year.

¶ 9    In June 2010, the trial court denied the petition. It did not increase support based on Michael's reduced obligations, increased bonuses, and increased travel. It modified child support slightly, however, due to a new base salary. It created the following downward sliding scale:

| Amount Earned *Gross* | Percentage of *Net* | Amount Due |
| --- | --- | --- |
| $0-$271,843 | 20% | $3043/month guaranteed |
| $271,843-$371,843 | 15% | $10,800/year if applicable |
| $371,843-$471,843 | 10% | $6900/year if applicable |
| $471,843-$521,843 | 5% | $2700/year if applicable |
| $521,843-$621,843 | 5% | $5400/year, if applicable |

age 25, whichever occurs first, will be distributed to him. If the college fund is insufficient, then college expenses will be paid 65% by Michael and 35% by Cherie.

In other words, the court bumped up the gross base salary from which the guaranteed child support was calculated, from $250,000 to $271,843. This resulted in an increase of the guaranteed monthly payment from $2596 to $3043. As will become important on appeal, this $3043 per month represented 20% of Michael's guaranteed net income at the time, *which must have been $182,000 per year* ($3043 x 12 months is $36,516 per year, which is 20% of $182,000). The court continued with a downward sliding scale for the next $350,000 in bonuses, just as it had before. (The court inverted certain numbers, such as $10,080 instead of $10,800. We kept the numbers as originally ordered. On appeal, Cherie argues for only the $3043 per month guaranteed, so it is not essential that we resolve the discrepancy.)

¶ 10                 A. Michael's Petition to Modify and the Hearing

¶ 11     In December 2015, Michael petitioned to reduce child support, based on his December 2014 termination and $1.4 million in severance payments ending that month. He would, however, continue to receive $83,000 per year in deferred compensation through the end of 2017. He attached a signed financial statement. He acknowledged that Cherie had recently lost her job. And, he pleaded that their son had increased needs, which included a diagnosis of attention deficit hyperactivity disorder (ADHD) and sensory deprivation disorder. However, this special-needs issue was resolved in a separate settlement concerning reallocation of decision-making authority and parenting time. (The new parenting agreement shows that Cherie continues to be the residential custodian.) Various events, such as Cherie's continued unemployment and the aforementioned negotiations over decision-making authority, delayed the hearing on the December 2015 petition to modify support.

¶ 12     Thus, in mid-2016, Michael filed an amended petition to reduce support. In conjunction with this petition, he attached an updated signed financial statement, dated April 2017. The

April 2017 statement detailed Michael's income, assets, and expenses. It was admitted into evidence at the April 2017 hearing.

¶ 13                    1. Evidence of Michael's Financial Resources

¶ 14    In his 2017 statement, Michael represented that his 2016 income had been $129,000. This did not include a virtually tax-free $400,000 withdrawal from a retirement account, which we will detail below. Michael further represented that his gross income for the first quarter of 2017 had been $91,517, on pace for over $360,000 per year. Also, and somewhat inconsistently, Michael stated that his gross income was $8677 per month. This included a $2641 pension benefit, $5416 in investment income, $600 in rental income from an Oswego rental property, and $20 in other dividends. He took $5205 in required deductions. This included state and federal income tax, but, given his age and/or employment status, not FICA, Medicare tax, or retirement contributions. It also included the $3043 support payment at issue. He did not list the $83,000 in deferred compensation that he had been awarded as part of his severance package.

¶ 15    Michael's assets included three homes. He owned one home in Naperville, where he resided much of the year. The Naperville home was valued at $375,000, and it had a remaining mortgage of $104,000. He owned a vacation home in Bozeman, Montana, which he visited often. The Bozeman home was valued at $775,000, and it had a remaining mortgage of $368,000. Finally, he owned the rental property in Oswego, which he paid for in 2016 with $161,000 cash. There was no remaining mortgage. Additionally, Michael owned two cars: a 2014 Audi, valued at $35,000 and with a remaining balance of $15,000, and a 2011 Ford F150, valued at $18,000 and with no remaining balance.

¶ 16    Michael's 2017 investment portfolio was valued at $2.585 million.  This included $1.625 million in his retirement accounts.  It also included $1.16 million in nonretirement brokerage accounts.

¶ 17    Michael's monthly personal expenses were $764, which included $185 for clothing and grooming, $195 for medical expenses outside of insurance, and $384 for insurance.  Michael also spent $790 on miscellaneous expenses, such as $200 for clubs and social obligations, $50 for books and magazines, $40 for computer software, and, notably, $200 for gifts, $100 for charitable donations, and $200 for vacations (not including the child's vacation costs).

¶ 18    Michael's monthly household expenses were approximately $6600.   This included approximately $2000 for mortgages, $2000 for real estate taxes, $470 for homeowner's and renter's insurance, $385 for gas, $280 for electricity, $322 for cable, $110 for water and sewage, $300 for maintenance and repairs, $150 for lawn care, $100 for furniture, $115 for a maid and cleaning service, and $400 for groceries.

¶ 19    Michael estimated his share of monthly expenses exclusive to M.H. at $1060.   This included $110 for clothing and grooming, $100 for education-related activities, $450 for medical expenses, $100 for childcare, $100 for lessons, $100 for vacations, and $100 for entertainment.

¶ 20    Michael's April 2017 financial statement was consistent with his December 2015 statement.  As in 2017, in 2015, he allocated $200 for gifts, $50 for charitable donations, and $200 for vacations (not including the child's vacation costs).

¶ 21    Michael submitted his credit card statements from 2015, 2016, and the first two months of 2017.  During this time, he incurred new charges of between $4000 and $18,000 per month.  He paid his statement in full each month.  These statements did not include the mortgages, real estate taxes, utilities, or repair and maintenance on Michael's multiple properties.  In the months

preceding the April 2017 hearing, his new charges, rounded to the nearest $100, were $7800 (October 2016), $11,000 (November 2016), $7000 (December 2016), $18,000 (January 2017), and $9400 (February 2017). The January and February 2017 statements showed travel to New Zealand, Florida, Barcelona, and Las Vegas. (However, much of this travel occurred in the final months of 2016.)

¶ 22    Michael further testified to his travels. Although not yet appearing on a credit card statement, Michael had also traveled to Argentina in 2017. Exclusive of airfare, the trip cost $5400 and included a guided fly-fishing expedition. Michael traveled domestically on a regular basis. He went to Florida several times per year to visit his other son. He frequented New York to visit his family and that of his new wife, who was from Connecticut. And, he spent time at his Bozeman residence.

¶ 23    Cherie presented a chart, based on documentary evidence, showing that Michael spent approximately $120,000 on travel in 2015 and 2016, evenly budgeted at $60,000 per year. In 2015, Michael traveled to New York/Connecticut (more than 10 separate trips), Montana (more than 10 separate trips, many of which included several-thousand-dollar fly-fishing expenses), Florida (5 separate trips), Las Vegas (2 separate trips), Michigan, and Wisconsin. Internationally, he made five separate trips to Europe, including Rome (two trips), Ireland, and France (two trips). The chart and documentary evidence showed constant travel, rarely resting more than a few weeks in the same place. This pattern continued in 2016, when Michael traveled domestically to many of the same places with the same frequency. He again enjoyed five separate international trips, this time to Los Cabos, the Baltic area (Denmark, Sweden, and Russia), Spain, New Zealand, and Argentina. Of all these vacations, Michael took M.H. on one trip to Florida, one trip to Washington D.C., and more than one trip to Montana. Michael did not

deny that this travel took place, and he admitted that the $60,000 per year in costs were accurate. Further, he admitted that his December 2015 and April 2017 financial statements, each of which allocated just $200 per month for vacations, were inaccurate. He explained, however, that he planned to spend less in the future.

¶ 24 Michael testified that, in 2015 and 2016, he made over $120,000 in charitable contributions, as well as gifts and informal loans to adult family members. Specifically, in 2015, Michael donated $52,000 to his church and $5325 to the Ronald McDonald House. The $52,000 donation reflected the yearly total of his standard monthly donations. Moving forward, however, he would not donate large sums to the church. In 2016, he gifted approximately $19,000 to his 27-year-old son. He paid for a portion of this son's medical insurance, and he helped to fund his son's fledging business endeavor. He also gave/loaned his brother nearly $10,000 and bought him an $11,500 boat. Similarly, he gave/loaned his sister $12,400. He expected that both his brother and his sister would reimburse him. Also in 2016, Michael became engaged; he purchased a $19,000 engagement ring for his now-wife.

¶ 25 Michael testified to $400,000 that he withdrew from a retirement account in 2016. The withdrawal generated less than $2000 in taxes. In testimony, Michael referred to the account as an IRA. However, his 2015 financial statement labeled that $400,000 as an annuity (but still under the umbrella of his retirement accounts). Michael used $110,000 to pay his 2015 income taxes, $161,000 to purchase the rental property in Oswego, and the remaining $129,000 to supplement his living expenses. No other evidence was presented as to the history or nature of this account, when the deposits were made, or whether there had ever been a tax-advantaged conversion. Importantly, Michael acknowledged that, despite having withdrawn the $400,000 in

2016, the total value of his retirement and nonretirement brokerage accounts fell by only $215,000 that same year, from $2.8 million to $2.585 million.

¶ 26　　Michael testified to his termination and ultimate retirement. In 2014, new management took over his company, and on December 31, 2014, he was involuntarily terminated. The company referred to the involuntary termination of senior executives like himself as retirement. Indeed, as a matter of pride, he preferred to tell people that he was retired, rather than terminated. He also told Cherie in a January 2015 e-mail that he was "fully retired," the context being that he wanted to inform her that he had more free time to spend with their son. Nevertheless, he did try to find new employment consistent with his skill and experience. A noncompete clause somewhat limited his search. His initial resume indicated that he sought only a high-level executive or consulting position. His resume specified that he sought contact only with a prospective company's high-level personnel, such as its CEO or COO. He soon learned that, at his age, the positions offered were for consultants. He did not continue to send out resumes. At his level, networking was the better approach. He worked with an executive recruiter and went on 10 interviews. However, as of the 2017 hearing, then age 64, he had not found new employment. The process was discouraging, and his job log showed many months with no search activity. He believed that the likelihood of finding a significant position in the future was extremely low.

¶ 27　　Finally, Michael testified that M.H. participated in three extracurricular activities: hockey, cross-country, and orchestra. Previously, M.H.'s hockey cost approximately $8000 per year. However, he had since joined a less competitive league, which cost approximately $3000 per year.

¶ 28　　　　　　　　　2. Evidence of Cherie's Financial Resources

¶ 29    Cherie testified to her finances, which are not in dispute.  For a number of years, Cherie had been earning approximately $150,000 per year.  She was licensed to broker the import and export of goods.  She maintained a family home in Glen Ellyn, which carried a mortgage of $1700 per month.  In late 2014 or early 2015, she lost her job.  It took her 20 months, until mid-2016, to find her current job at Morton Salt.  It took that long because she wanted to stay in the area to provide continuity for M.H., whose medical issues required her attention.  Her new salary was $135,000.  Bonuses were possible, but she did not receive a bonus in 2016.  Also in mid-2016, she sold her Glen Ellyn home.  As a result of the sale, she held $145,000 in her checking account, which she planned to use toward the down payment on her next home.  In the interim, she rented a home in Lisle for $2900 per month.  This did not include lawn care and utilities. The home had a nice yard, even bigger than the yard M.H. had enjoyed in Glen Ellyn.  Cherie's mother lived in the home two-thirds of the year.   Cherie's mother had her own home in Michigan, but Cherie relied upon her mother to help care for M.H.  If not for her mother, Cherie would have to seek after-school childcare.  Cherie paid her mother a nominal $100 per month. Despite the move, M.H. could stay in the same school because he had been using Michael's address to attend school in Naperville.  Cherie planned to buy her next home in Naperville to provide continuity for M.H.

¶ 30    Aside from the $145,000 in her checking account, which would be depleted when she purchased a home, Cherie held approximately $25,000 in nonretirement brokerage accounts and $860,000 in retirement accounts.  She also held $42,000 in a "Bright Start" account, which was to be used for M.H.'s college education.  Cherie owned one vehicle, a 2010 Volvo valued at $11,000 with no outstanding balance.

¶ 31    Cherie's April 2017 financial statement detailed her income and expenses. Her gross income in 2016 had been $55,000 because she had been unemployed for the first part of the year. Her current gross monthly income from all sources was $11,425. She took $2916 in required deductions, including state and federal income taxes, FICA, Medicare tax, and health-insurance premiums. She took an additional $2262 in optional deductions, such as for her retirement plans and flexible spending accounts.

¶ 32    Cherie spent $685 per month on personal expenses, such as clothes, grooming, and medical. She spent approximately $1000 on miscellaneous expenses, including $500 for a club membership and social obligations, $300 to budget for vacations (not including the child's vacation costs), and approximately $200 in donations to the church, gifts, books, magazines, and computer software.

¶ 33    Cherie spent $5053 per month to run her household. This included, as mentioned, $2900 in rent, as well as $100 in lawn care, $110 in renter's insurance, $110 in gas, $125 in electricity, $210 in phone service, $170 in cable, $75 in water and sewer, $100 in laundry and dry cleaning, $150 in furniture repair and replacement, $750 in groceries, and $250 in home repair and maintenance. Cherie explained that she was not currently incurring $250 in home repair and maintenance, but she anticipated that cost once she purchased her new home. She did not have a maid or cleaning service.

¶ 34    Separately, Cherie spent $700 per month on transportation (which included gas, insurance, maintenance, tolls, and parking). She also spent $125 per month on the household pet.

¶ 35    Cherie estimated her share of expenses exclusive to M.H. at $2005 per month. This included $555 in uninsured medical expenses, largely for behavioral therapy and medication;

$350 for extracurricular lessons; $250 for vacations; $180 for summer camps; $125 for education-related expenses, such as school-sponsored events, lunches, and books; $190 for clothing and grooming; $75 for entertainment; $25 for gifts for others; $45 for M.H.'s cell phone; $60 for sports equipment; $100 for childcare; and $50 for allowances. Cherie took M.H. on one nice vacation per year, such as to a resort in the Bahamas. Other trips throughout the year were more modest, such as remaining in the Midwest.

¶ 36                              3. The Trial Court's Order

¶ 37    In September 2017, the trial court issued its decision. The court granted Michael's petition to modify, reducing Michael's support amount from $3043 to $1700 per month, retroactive to January 1, 2017. It relieved Michael of any responsibility to pay for ordinary medical expenses. Cherie would bear sole responsibility for ordinary medical expenses, and the parties would split extraordinary medical expenses. The court also capped Michael's contribution to extracurricular activities at $3500 per year. Thus, absent an extraordinary medical event, Michael's maximum child-support contribution would be $23,900 per year.

¶ 38    The court acknowledged that M.H.'s needs had increased since 2010, due to his age. Nevertheless, it determined that there had been a substantial change in circumstances justifying a reduction of the support award, due to Michael's change in employment status and reduced income.

¶ 39    In setting the new support amount, the court found that Michael's 2017 section 505 net income was approximately $78,000 per year, composed of $30,000 to $40,000 in dividends and interest, $31,692 in pension income ($2641 per month), and $7200 in rental income from the Oswego property. The court did not include Michael's $83,000 in annual deferred compensation. Also, the court did not include any of Michael's $400,000 retirement-account

withdrawal. It reasoned that, per *In re Marriage of McGrath*, 2012 IL 112792, ¶ 14, accessing one's assets cannot constitute income for purposes of child support. Turning to the estimated $78,000 per year, the court noted that it was mostly tax free or low tax. The 20% guideline amount for the $78,000 was $1300 per month. The court acknowledged that, given Michael's $2.5 million in assets, $1300 per month would not provide the child with a standard of living close to that which he would have had if the marriage had not been dissolved. So, the court issued an upward deviation, bringing the total to $1700 per month.

¶ 40   The court found it understandable that Michael had traveled so much in 2015 and 2016, given that he had just received a $1.4 million severance. However, the court "found it difficult to believe" that this kind of spending would continue.

¶ 41   The court rejected Cherie's position that Michael should draw upon his $2.5 million in assets, and the interest earned from it, in order to keep the child support at $3043 per month. The court stated:

"Assuming [Michael's] income is now only $78,000 per year, Michael would be required to draw down his assets in the amount of $193,000 per year in order to equal the $271,000 annual income upon which child support was based. Assuming he lives for another 20 years, till age 84, this would require a sum of $3,860,000. Michael does not have this sum available. In addition, it would assume that Michael wants to leave $0 in his estate for his heirs. To require, or to impute to someone the requirement that they regularly draw on their assets until liquidated, when they are not actually currently engaged in doing that, is speculative and not supported by the facts."

¶ 42   Finally, the court made the following findings of fact to support its decision. Michael was unlikely to obtain employment, considering his age and salary history. On the other hand,

"Cherie's income has increased significantly." She earns $135,000 but chose to remain unemployed for 20 months: "Cherie intentionally did not seek employment, because she wanted to focus on the needs of [M.H.]" Both parties have traveled extensively and extravagantly with M.H. Michael has assets of approximately $2.5 million. Cherie has assets of approximately $1 million. The expenses exclusive to M.H. are $3435 per month, as agreed by the parties (Michael's $1700 obligation comprising one-half that amount).

¶ 43                    B. Cherie's Motion to Reconsider

¶ 44    Cherie moved to reconsider, and in December 2017 the court heard argument. Acknowledging a split of authority, she argued, *inter alia*, that the $400,000 withdrawal from a retirement account was income for the purposes of setting child support. See *In re Marriage of Lindman*, 356 Ill. App. 3d 462, 466 (2005) (Second District) (IRA withdrawals were section 505 income). But see *In re Marriage of O'Daniel*, 382 Ill. App. 3d 845, 850 (2008) (Fourth District) (IRA withdrawals were not section 505 income).

¶ 45    The court disagreed that the withdrawal should be counted as income. It stated that Michael had accumulated that asset in the past and now was simply drawing on it. The court did not believe that a distinction should be made between withdrawals from an IRA, a mutual fund, or a checking account. Moreover, this was not a periodic payment; it was a one-time occurrence. The court allowed that perhaps an IRA withdrawal could be treated as income, but only if it was used to pay for everyday living expenses, such as for a mortgage, a car, or food. "You can't avoid child support by saying, hey, I have no income but I am living off my assets." However, "if he pulls the money out for a one-time expenditure to go to Europe, that is not a monthly living expense, so why would I consider that as his income?" The court stated that "there was no evidence that [Michael] was living off his assets."

¶ 46     Cherie responded that, in *McGrath*, the supreme court expressly distinguished between withdrawals from an IRA and withdrawals from a savings account. *McGrath*, 2012 IL 112792, ¶ 10 n.2. It held only that withdrawals from a savings account were not income, declining to address whether withdrawals from an IRA were income. *Id.* This left *Lindman*, which held that IRA withdrawals were income, to control this case. And, *Lindman* specifically held that an IRA withdrawal need not be periodic or recurring to count as income. Also, Cherie disagreed that a party's use of an IRA withdrawal dictated whether it should be counted as income. Michael's use of an IRA withdrawal for lavish vacations showed only that he continued to live a lavish lifestyle. This weighed in favor of maintaining the $3043 support amount, not against it.

¶ 47     Michael added that, although the withdrawal came from a retirement account, it did not specifically come from an IRA. Rather, it came from a retirement annuity.

¶ 48     The court agreed with Michael that, whatever the nature of the $400,000 withdrawal, it already belonged to him. It was not new money. It was not income, and it could not be used to calculate the support amount. The court denied the motion to reconsider. This appeal followed.

¶ 49                                     II. ANALYSIS

¶ 50     Cherie challenges the trial court's decision to reduce child support to $1700 per month. She argues that Michael failed to establish that a substantial change in circumstances warranted a reduction of the $3043 support amount, which had been based on a net income of $180,000 per year. Accordingly, she asks this court to reinstate the 2010 award. She also argues that, even if there was a substantial change in circumstances, the statutory factors support the $3043 support amount. She asserts that Michael's net income was much higher than the $78,000 that the court determined, because the court forgot to include the $83,000 in deferred compensation and to account for the $400,000 withdrawal from the retirement account. And, finally, she argues that,

even if Michael's net income does not result in a guideline amount of $3043, the circumstances, particularly Michael's wealth and spending patterns, warrant an upward deviation.

¶ 51     A child-support judgment generally can be modified only upon a showing of a substantial change in circumstances. *In re Parentage of I.I.*, 2016 IL App (1st) 160071, ¶ 53. "The burden of showing a substantial change in circumstances sufficient to justify a modification of a child support award is on the party seeking the relief." *In re Marriage of Kern*, 245 Ill. App. 3d 575, 578 (1993).   Once the court determines that modification is appropriate, the court should consider the statutory guidelines when determining the new child-support amount. *In re Marriage of Stockton*, 169 Ill. App. 3d 318, 325 (1988).   Both parties agree that, based on the timing of Michael's petition, 20% of Michael's net income is the applicable statutory guideline support amount for one child.   750 ILCS 5/505(a)(1) (West 2016).   Should the court choose to deviate from the guidelines, it shall state the amount that would have been ordered under the guidelines and the reason for the variance.   *Id.* § 505(a)(2).   It should consider the financial resources of both the custodial and noncustodial parents; the educational, physical, mental, and emotional needs of the child; and the standard of living the child would have enjoyed had the marriage not been dissolved.   *Id.*   We review a trial court's decision to modify child support for an abuse of discretion.   *In re Marriage of Rogers*, 213 Ill. 2d 129, 135 (2004).   The trial court's factual conclusions supporting the modification will stand unless they are against the manifest weight of the evidence.   *In re Marriage of Eberhardt*, 387 Ill. App. 3d 226, 233 (2008).   A court abuses its discretion when no reasonable person would agree with the decision or when it is obvious that the court acted arbitrarily and without conscientious judgment.   *In re Marriage of Turrell*, 335 Ill. App. 3d 297, 307 (2002); *In re Marriage of Schrimpf*, 293 Ill. App. 3d 246, 252 (1997).   A decision is against the manifest weight of the evidence when an opposite conclusion is

apparent or when the court's findings appear to be unreasonable, arbitrary, or not based on evidence. *Eberhardt*, 387 Ill. App. 3d at 233.

¶ 52    Before engaging in a traditional modification analysis, we address Cherie's arguments that the trial court erred in failing to include as income, or otherwise account for, Michael's $83,000 in deferred compensation and $400,000 retirement account withdrawal.  Addressing these issues up front will make it easier to determine whether Michael has suffered a substantial change in circumstances that warrants the reduction of his support obligation and, if necessary, to determine Michael's net income, the guideline amount, and any deviation from the guideline amount.

¶ 53                        A. Section 505 Income

¶ 54    Section 505(a)(3) broadly defines net income as "the total of all income from all sources, except" certain specified deductions, such as federal and state income taxes, social security payments, mandatory retirement contributions, union dues, individual and dependent insurance premiums, prior obligations of support or maintenance, and expenditures for the repayment of certain debts.  750 ILCS 5/505(a)(3) (West 2016); see *Rogers*, 213 Ill. 2d at 136.  Definitions of income accepted by our supreme court include: (1) " 'something that comes in as an increment or addition ***[,] a gain or recurrent benefit that is usu[ally] measured in money ***[,] the value of goods and services received by an individual in a given period of time' " (*Rogers*, 213 Ill. 2d at 136 (quoting Webster's Third New International Dictionary 1143 (1986))) and (2) " '[t]he money or other form of payment that one receives, usu[ally] periodically, from employment, business, investments, royalties, gifts and the like' " (*id.* at 137 (quoting Black's Law Dictionary 778 (8th ed. 2004))).  Under these definitions, a variety of resources that would not be taxable under the Internal Revenue Code will qualify as income for the purposes of child support.  *Id.*  A

nonrecurring, one-time income source must be included in the court's computation of net income. *Id.* at 139. However, if the evidence shows that the parent is unlikely to continue receiving payment from that source, then the court may consider that when determining whether and to what extent a deviation from the guideline amount is appropriate. *Id.* If an income source stops earlier than anticipated, the obligor parent may seek a modification. *Id.*

¶ 55　Consistent with this understanding of income, courts have determined the following to constitute income under section 505(a)(3): (1) deferred compensation (*Posey v. Tate*, 275 Ill. App. 3d 822, 826 (1995)); (2) pension payments (*People ex rel. Myers v. Kidd*, 308 Ill. App. 3d 593, 596 (1999)); (3) a military allowance (*In re Marriage of McGowan*, 265 Ill. App. 3d 976, 978 (1994)); (4) a gift from parents (*Rogers*, 213 Ill. 2d at 137); (5) a lump-sum worker's compensation award (*In re Marriage of Dodds*, 222 Ill. App. 3d 99, 103 (1991); *cf. Villanueva v. O'Gara*, 282 Ill. App. 3d 147, 151 (1996) (the entire amount of a personal injury settlement should not have been included as income, where the settlement largely made the parent whole and did not increase his wealth)); and (6) IRA disbursements (*Lindman*, 356 Ill. App. 3d at 466 (Second District). But see *O'Daniel*, 382 Ill. App. 3d at 850 (Fourth District)).

¶ 56　　　　　　　　　　　　　1. Deferred Compensation

¶ 57　Deferred compensation is income for the purposes of determining child support. *Posey*, 275 Ill. App. 3d at 826. The trial court erred in failing to include Michael's $83,000 in deferred compensation when determining his 2017 income. Michael concedes this. Thus, as we proceed in our analysis, we do so with the understanding that Michael's net income is, at a minimum, $128,000 (taking the low estimate of the trial court's $68,000 to $78,000 range, adding $83,000 in deferred compensation, and subtracting $23,000 in tax obligations that are likely to come with the deferred compensation).

¶ 58                                    2. IRA Withdrawals

¶ 59    The question of whether IRA withdrawals constitute section 505 income is not so simple. Broadly, the Second District holds that they do. However, the case law is split. As noted, two cases specifically address whether IRA withdrawals constitute income for the purposes of child support: *Lindman*, from the Second District, and *O'Daniel*, from the Fourth District.

¶ 60    In *Lindman*, the trial court based the father's support obligation on an income of $80,000. Two years after the divorce, in addition to his $80,000 salary, the father received $75,000 in IRA disbursements. (The court did not clarify whether the father was of retirement age, withdrawing from his IRA without penalty.) Nevertheless, he obtained a court order reducing his support obligation. (The court did not explain why.) Three years after the divorce, the father lost his job due to alcohol abuse. That year, in addition to approximately $40,000 in partial salary, he received $80,000 in IRA disbursements. The next year, the court reinstated the original support amount, finding that the IRA disbursements had constituted income. Therefore, his income was $120,000 and there was no reason why he could not pay the original support amount, which had been based on an $80,000 salary.

¶ 61    This court affirmed, agreeing that the IRA disbursements constituted income for child-support purposes. *Lindman*, 356 Ill. App. 3d at 466. We explained:

> "We see no reason to distinguish IRA disbursements from [other monies that have been labeled income, such as deferred compensation, worker's compensation awards, military allowances, and pensions]. Like all of these items, IRA disbursements are a gain that may be measured in monetary form. [Citation.] Moreover, IRA disbursements are monies received from an investment, that is, an investment in an IRA. [Citations.] Thus, given its plain and ordinary meaning, 'income' includes IRA disbursements." *Id.*

We further held that it did not matter whether the disbursements were recurring. *Id.* at 467. Should the disbursements stop or lessen, the father could petition to modify the support award. *Id.* at 468.

¶ 62 Separately, we acknowledged that, in a future case, a court could be called upon to determine what percentage of an IRA withdrawal should be counted as income. *Id.* at 470. We would not address it there, however, where the father did not raise a concern of "double counting." *Id.*

¶ 63 Next, in *O'Daniel*, the father suffered two periods of unemployment over a two-year period. During each of those periods, he withdrew approximately $50,000 from his IRA to pay his living expenses, mortgage, and child-support obligation. At the beginning of the first period, the father petitioned to modify his support obligation, based on his unemployment. At the hearing, he argued that the trial court should not consider his IRA withdrawals as income, because, as in a savings account, he had already accumulated those funds. The trial court agreed and, accordingly, reduced the support amount from approximately $1000 per month to $750 per month.

¶ 64 The appellate court affirmed, agreeing that the IRA withdrawals were not income. *O'Daniel*, 382 Ill. App. 3d at 850. The court explained:

"IRAs are ordinarily self-funded by the individual possessing the retirement account. Except for the tax benefits a person gets from an IRA and the penalties he or she will incur if he or she withdraws the money early, an IRA basically is no different than a savings account, although the risks may differ. The money the individual places in an IRA already belongs to that individual. When an individual withdraws money he placed into an IRA, he does not gain anything as the money was already his. Therefore, it is not

a gain and not income. The only portion of the IRA that would constitute a gain for the individual would be the interest and/or appreciation earnings from the IRA.

[The mother] does not state in her brief what portion of [the father's] IRA was made up of his contributions. As a result, we cannot say what portion of [his] withdrawals might have constituted income for child-support purposes." *Id.*

¶ 65    We are not convinced that *Lindman* and *O'Daniel* are in absolute conflict. *Lindman* stated that IRA withdrawals are income, after subtracting for "double counting." (It did not consider "double counting," because the appellant did not raise the issue.) *O'Daniel* stated that IRA withdrawals are not income, except for that portion representing interest and appreciation. (It did not consider interest and appreciation, because the appellant did not raise the issue.) Thus, both *Lindman* and *O'Daniel* allow for the possibility that a portion of IRA withdrawals would constitute income.

¶ 66    *Lindman* stated that double counting would occur if earnings deposited into IRA were counted as income both in the year they were deposited and in the year they were withdrawn. *Lindman*, 356 Ill. App. 3d at 470. To avoid that double counting, the court might have to determine what percentage of the IRA was considered income in the year it was deposited and discount that amount from the calculation of income in the year of withdrawal. *Id.* The *Lindman* court detailed a double-counting hypothetical where the father contributed to and withdrew from the IRA during years that he was paying child support. However, we did not preclude the double-counting scenario set forth in *O'Daniel*. The double-counting scenario set forth in *O'Daniel* was broader. *O'Daniel* excluded as income not only what had already been documented as income in a prior support year, but anything that was not new growth, interest, or appreciation. *O'Daniel*, 382 Ill. App. 3d at 850.

¶ 67    Other courts, in various contexts, have tangentially weighed in on the issue of whether IRA withdrawals constitute income.  We set forth the developing law because the supreme court has not yet decided whether and to what extent IRA withdrawals constitute income.

¶ 68    In *Eberhardt*, 387 Ill. App. 3d at 232-33, the First District upheld the trial court's decision to characterize IRA withdrawals as income in the year they were made, even if some double counting had occurred, because that characterization had been only a small part of its support decision, which primarily had been based on the father's lack of credibility and failure to show that the support amount should be reduced.

¶ 69    In *In re Marriage of Pratt*, 2014 IL App (1st) 130465, ¶ 25, the court held that $5000 converted from a traditional IRA to a Roth IRA was income, even though no withdrawal was made, because the conversion was "a taxable event indicating some type of benefit or income." *Pratt* is different from our case, because there no withdrawal was made, but it demonstrates that IRA transactions can be counted as income.

¶ 70    Finally, in *In re Marriage of McLauchlan*, 2012 IL App (1st) 102114, ¶ 26, the court declined to categorize IRA withdrawals as income for the purposes of awarding *maintenance*, but it expressly distinguished child-support cases that categorize IRA withdrawals as income, noting that defining income broadly for child-support purposes fulfills the primary objective of securing the child's support.

¶ 71    We also discuss two unpublished cases, not for precedential value or even guidance, but to highlight the difficulty courts have had in deciding whether to categorize withdrawals from retirement accounts as section 505 income or to otherwise account for the withdrawals when assessing the parent's ability to pay child support.  In *In re Marriage of Dillavou*, 2012 IL App (2d) 100681-U, ¶¶ 33-34, we held that the one-time $45,000 IRA distribution was *not* income,

where the day-trader father incurred a penalty for the early withdrawal, which he took to cover his living expenses during a low-income year and which he used, in part, to meet his existing child-support obligation. In *In re Marriage of Knauf*, 2013 IL App (2d) 120956-U, ¶¶ 9, 14, we held that the IRA withdrawals *were* income because it would be inequitable to allow the father to support his children as though his net income was $25,000, when, due to the IRA withdrawals, he lived on a net income of $50,000 per year.

¶ 72    In *Dillavou* and *Knauf*, as well as in *Eberhardt*, equity appears to have played a role in the court's determination of whether the withdrawal from an IRA was section 505 income. We believe that the better approach is to determine, in a mathematical manner and without respect to equity, which portion of the IRA withdrawal constitutes income. However, even if the court labels no portion of the withdrawal as income, the analysis does not end. The withdrawal still could show that the obligor parent's circumstances have not changed, because the parent, planning for retirement through the funding of retirement accounts, has budgeted for a lifestyle similar to that provided by the net-income amount that justified the original order. Alternatively, if circumstances have changed, the withdrawal could show that equity demands an upward deviation from the income-based guideline amount. We believe that the supreme court's holding in *McGrath* supports this approach.

¶ 73    In *McGrath*, the supreme court expressly declined to settle the question of whether IRA withdrawals constituted section 505 income. *McGrath*, 2012 IL 112792, ¶ 10 n.2. The court reviewed the initial support award, not a modification, and, therefore, did not engage in a substantial-change analysis. Nevertheless, *McGrath* is still useful to our discussion because it explains that whether a withdrawal is income is not necessarily dispositive in determining the reasonable support amount. *Id.* ¶ 16. In short, in setting the support amount, if the withdrawal is

income, its value must go into the first part of the trial court's analysis—that is, its calculation of net income and of the guideline support amount based on that income figure. *Id.* ¶ 13. If the withdrawal is not income, it may be considered in the second part of the court's analysis—that is, its determination of whether and to what degree a deviation from the net-income-derived guideline amount is warranted. *Id.* ¶ 18.

¶ 74 In *McGrath*, the father was unemployed at the time of the divorce, so the trial court delayed setting a child-support amount. Subsequently, the mother petitioned to set the child-support amount. The father remained unemployed, but he had been withdrawing $8500 per month from his savings account to meet expenses. The trial court set the support amount at $2000. It explained that it was not imputing to the father an income based on voluntary unemployment. Instead, the court chose to view the father as using assets as a substitute for income rather than seeking employment. It based the $2000 support amount on the assets available to him to meet his living expenses. Although the court did not label the $8500 withdrawals as income, it effectively treated them as income in calculating the support amount. This was evident because it used the $8500 figure to determine that the guideline amount was $2380 ($8500 x 28%). It then deviated downward from that amount by $380, reaching its $2000 award. The appellate court affirmed the award, stating that the trial court was right to treat the $8500 withdrawals as income.

¶ 75 The supreme court held that the $8500 withdrawals could not be treated as income. "Money that a person withdraws from a savings account" "already belongs to the account's owner, and simply withdrawing it does not represent a gain or benefit to the owner." *Id.* ¶ 14. Instead of treating the $8500 withdrawals as income, the trial court should have recognized the father's negligible net income, but then made a specific finding that the guideline amount

generated from that figure was inappropriate and that his substantial assets warranted a higher award. *Id.* ¶ 18. Thus, the court remanded for the trial court to perform the correct analysis. *Id.* First, the trial court should determine the true net income, even if it was negligible, and the corresponding guideline amount. *Id.* Then, the court could determine that an upward deviation was warranted, based on the $8500 withdrawals. *Id.*

¶ 76 Returning to the instant case, the trial court erred by failing to require Michael, who bore the burden of proof at trial, to show why, despite our directive in *Lindman*, certain portions of the IRA withdrawal were not section 505 income. It also erred by failing to otherwise account for the IRA withdrawal. The trial court misstated the evidence surrounding the IRA withdrawal when it stated that Michael merely moved funds from the IRA to new investments, such as the Oswego rental property. This conflicts with Michael's own testimony that he used $129,000 from the withdrawal to supplement his living expenses. Also, the court erred when it stated, hypothetically, that it would have considered the withdrawal if Michael had used it for day-to-day living expenses, but not a one-time trip to Europe. Setting aside that Michael took 10 international trips, not 1, we agree with Cherie's response: his use of the withdrawal for a lavish vacation showed that he continued to live a lavish lifestyle. We acknowledge that Michael characterizes the account as a retirement annuity, rather than an IRA. Whatever the exact nomenclature of the retirement account, however, the court erred in not considering the withdrawal of significant retirement funds that Michael had reserved for this stage in his life and the withdrawal's impact on Michael's lifestyle in determining whether his circumstances had changed.

¶ 77 We reject Michael's argument that the withdrawal is irrelevant because it occurred in 2016. Although Michael withdrew the money in 2016, he spent it in the months preceding the

hearing and it reflected his circumstances at the time of the hearing. Having assessed the relevance of the $83,000 in deferred compensation and the $400,000 IRA withdrawal, we proceed to the substantial-change analysis.

¶ 78                     B. No Substantial Change in Circumstances

¶ 79     A substantial change in circumstances typically means that the child's needs, the obligor parent's ability to pay, or both have changed since the entry of the most recent support order. See, *e.g.*, *In re Marriage of Pylawka*, 277 Ill. App. 3d 728, 731 (1996). Here, Michael conceded in his pleading that M.H.'s needs have increased since 2010 due to M.H.'s medical issues and expenses. As set forth in the parties' financial statements, as much as $1000 per month in M.H.'s medical costs were not covered by insurance. And, per the trial court's order, Michael would not contribute to ordinary medical costs. This means that a significant portion of the support award would go toward medical costs. The trial court agreed that M.H.'s needs presumably have increased since 2010 because he has grown from a young child to an early adolescent. Also, Michael acknowledged that Cherie endured 20 months of unemployment. It is within this context that Michael pleaded a reduced ability to pay, based on a change in his employment status. As the petitioner, Michael had the burden to show that the change in his employment status resulted in an economic reversal sufficient to constitute a substantial change in circumstances, warranting a reduction of support, even in the face of M.H.'s increased needs. No reasonable person could have found that Michael met his burden. In fact, the evidence supports the opposite conclusion, *i.e.*, that Michael has the means to continue to meet his $3043 monthly support obligation without risking his financial security in retirement.

¶ 80     Broadly, the trial court based its substantial-change determination entirely on Michael's change in employment status and reduced income. While these are important factors, they are

not the only factors. The court erred by failing to consider all of the factors relevant to a substantial-change analysis, which we set forth below. Moreover, the court's ruling contains factual inaccuracies and flawed logic. Michael conceded as much when he opened his oral argument with the following statement: "At about 5 a.m. this morning, I re-read [the trial court's] decision on financial issues in this case. And, I decided I would start my argument off by emphasizing a point in our brief, which is that this court can affirm that decision for any basis supported in the record."

¶ 81 In a substantial-change analysis, income is not the only measure of a parent's continued ability to pay child support. *In re Marriage of Deike*, 381 Ill. App. 3d 620, 627-28 (2008). Rather, income becomes the controlling factor *after* there has been a substantial-change determination and as the court sets the new guideline amount (and, even then, the court must look to the other factors to determine whether a deviation from the guideline amount is warranted). *Stockton*, 169 Ill. App. 3d at 325. To determine whether there has been a substantial change in circumstances, the court should take a holistic view of the parent's financial position and consider all financial resources, including assets and even the financial status of a new spouse. *Deike*, 381 Ill. App. 3d at 627-28. The court should consider all money and property that the parent can access, even if it means selling the property. *Id.* On balance, the parent should not be forced to unduly compromise his financial position or his ability to meet his own needs. *Id.* at 627.

¶ 82 In *Deike*, the engineer father lost his job through no fault of his own, and his income dropped by nearly one-half. The court determined, however, that he had *not* suffered a substantial change sufficient to reduce his obligation to contribute to college expenses and pay ordinary child support, where he received a substantial severance and could access $100,000 in

funds tied up in his lake house. *Id.* at 629. The dissent disagreed that the father's change in employment status and resulting financial position did not constitute a substantial change in circumstances, but did not disagree with the majority's statement of the law. *Id.* at 637 (Cook, J., dissenting). The law is that, when considering whether there has been a substantial change in circumstances, the court, mindful of the child's needs, must take a holistic view of the obligor's financial position to determine whether he has the resources to meet his existing obligation without unduly compromising his ability to meet his own needs. *Id.* at 627-28.

¶ 83 We begin by putting into perspective the key change here—Michael's early retirement and reduced income. In considering whether a parent has a reduced ability to pay child support, the trial court may consider any substantial economic reversal resulting from a change in employment. *In re Marriage of Horn*, 272 Ill. App. 3d 472, 476 (1995). An economic reversal as a result of a change in employment, if made in good faith, may constitute a change in circumstances sufficient to warrant modification of a child-support order. *In re Marriage of Gosney*, 394 Ill. App. 3d 1073, 1076 (2009). In determining whether such a change in employment is made in good faith, the crucial consideration is whether the change was prompted by a desire to evade financial responsibility for supporting the children or otherwise jeopardize their interests. *Id.* at 1076-77. Where the change in employment was made in bad faith, the court may impute an income to the parent for the purposes of setting child support. *Id.* at 1077.

¶ 84 We will defer to the trial court's factual and credibility determination that there was no bad-faith element to Michael's lack of employment. In 2014, Michael was involuntarily terminated. He conducted a job search, but he searched for only high-level positions, as his experience and wealth gave him the privilege to be discriminating. Michael did not testify that he took a long view of his career such that he eschewed less prestigious, interim employment

because it could impair his chances of regaining a high-level position in the future. Rather, Michael simply had little financial incentive to search for or accept a new job that paid considerably less than his old job. He could afford not to work. Michael testified, and the trial court found, that his chances of finding "significant" employment in the future were extremely low. In January 2017, when the reduction in child support took effect, Michael was just one year short of traditional retirement age. Under these nuanced circumstances and with deference to the trial court on credibility, we classify Michael's employment status, going forward from January 2017, as a good-faith retirement. This means that, like the trial court, we will not impute income to Michael. A finding of a good-faith retirement, however, does not resolve the central question of whether Michael's change in employment status and reduced income resulted in an economic reversal that substantially impaired his ability to satisfy his child-support obligation.

¶ 85    There is a dearth of case law addressing good-faith retirement in the context of child support. Indeed, the existing case law generally presumes that the supporting parent should be working, that unemployment and retirement are associated with reduced means, and that drawing upon retirement assets creates a hardship. See, *e.g.*, *Childerson v. Hess*, 198 Ill. App. 3d 395, 398 (1990). This case is different. This case challenges the assumption that retirement results in an economic reversal and a reduced ability to pay child support. Sometimes, as here, retirement is simply a life stage, in which the obligor may draw upon well-funded accounts to satisfy existing obligations. Put simply, withdrawing funds from a retirement account when one is in fact retired and of retirement age is altogether different from withdrawing funds mid-career and in one's mid-forties.

¶ 86    Our own research did not reveal a child-support case where the retirement was not necessarily a reversal of economic fortune or a hardship. Perhaps due to the typical age of a

parent in a child-support case versus an ex-spouse in a maintenance case, only maintenance cases have thus far explored the particularities of overall financial position and need in the context of retirement. We seek guidance, therefore, in maintenance cases. In assessing whether a substantial change has occurred, both child-support and maintenance cases direct the court to take a holistic view of the obligor's financial position to determine whether he has the resources to meet his existing obligation without unduly compromising his ability to meet his own needs. See, *e.g.*, *Deike*, 381 Ill. App. 3d at 627-28 (child support); *Schrimpf*, 293 Ill. App. 3d at 253 (maintenance). This commonality renders maintenance cases instructive. In discussing maintenance cases, we are mindful that the duty to support one's minor child is more absolute than the obligation to continue maintenance. See, *e.g.*, *McLauchlan*, 2012 IL App (1st) 102114, ¶ 26. Thus, a court's refusal to relieve the husband of his maintenance obligation is all the more compelling. If the husband's retirement resources enable him to continue maintenance despite his reduced income, they certainly would enable him to continue child support.

¶ 87   Illinois courts have routinely held, in the context of maintenance, that reduced income in retirement does not automatically constitute a substantial change in circumstances. Rather, reduced income in retirement is but one of several factors to consider in determining whether there has been a substantial change in circumstances. *Baker v. Baker*, 28 Ill. App. 3d 680, 682 (1975). In *In re Marriage of Anderson*, 409 Ill. App. 3d 191, 204-09 (2011), for instance, the court considered the following factors when it determined that there was a substantial change in circumstances: (1) the decline in value of retirement accounts from $200,000 to $63,000, (2) the projected depletion of retirement accounts within two years, (3) the decline in lifestyle such that the obligor no longer belonged to social clubs, (4) advanced age (80) and poor health, and (5) the

possession of two homes in addition to a primary residence, which were valued between $270,000 and $535,000.

¶ 88    More on point with the present case, in *Schrimpf*, 293 Ill. App. 3d at 253, the court held that there had *not* been a substantial change in circumstances, despite the obligor's reduced income in retirement.  The husband's working income had been $67,000, and his retirement income, composed of social security and pension payments, was $36,000.  The court reasoned that, despite his reduced income, the husband "planned well" for retirement and could access additional funds from his pension and insurance policy to satisfy his $750 monthly maintenance obligation.  *Id.*  The terms of the husband's pension allowed him to increase his monthly distribution at any time.  Requiring the husband to reach into retirement assets to fulfill his existing obligation was not tantamount to an increase in the maintenance award, because the husband was comparatively well off, with access to $600,000 in cash and ownership of a vacation home with his second wife.  *Id.* at 251-52.  The court cautioned that whether an obligor may rely upon his retirement status to support a substantial change in circumstances, or whether he should instead be expected to reach into his retirement assets to meet his existing obligations, should be determined on a case-by-case basis.  *Id.*  Factors to consider include age, health, motive for retirement, timing of retirement, the receiving spouse's ability to be self-sufficient, and the obligor spouse's ability to pay.  *Id.* at 252.  *Schrimpf* illustrates that, when retirement is not a reversal of economic fortune but a natural life stage, an obligor may be expected to reach into retirement assets to a reasonable degree in order to fulfill his obligations.

¶ 89    Drawing from the aforementioned cases, the factors to consider in determining whether a parent who has retired has suffered a substantial change in circumstances or, instead, should be expected to reach into retirement assets in order to fulfill his existing support obligation include:

(1) the importance of the obligation, particularly in relation to the parent's other obligations and expenditures (*McLauchlan*, 2012 IL App (1st) 102114, ¶ 26; *Deike*, 381 Ill. App. 3d at 637 (Cook, J., dissenting) (observing that ordinary support during dependency is a higher priority than support for college); *Anderson*, 409 Ill. App. 3d at 206; *Schrimpf*, 293 Ill. App. 3d at 252 (both observing that maintenance obligations take precedence over vacation homes)); (2) the child's needs (*Pylawka*, 277 Ill. App. 3d at 731); (3) the parent's income (*Schrimpf*, 293 Ill. App. 3d at 252); (4) the good faith of the parent's retirement, including the motivation and timing of the retirement (*id.*); (5) the parent's lifestyle (*Anderson*, 409 Ill. App. 3d at 206); (6) the strength of the parent's overall financial position, including the accessibility and demonstrated growth potential of funds (*Deike*, 381 Ill. App. 3d at 627-28); and (7) whether fulfilling the existing obligation will jeopardize the parent's financial security in retirement, including the impact that the withdrawals will have on the overall portfolio, the child's remaining years of dependency, and the parent's age and health (*id.*; *Schrimpf*, 293 Ill. App. 3d at 253). This nonexhaustive list will develop with the case law. For now, these factors provide more specific expressions, within the context of a parent's retirement, of the test for a substantial change in circumstances, *i.e.*, a substantial change in the child's needs or the parent's ability to pay.

¶ 90    Turning to these factors, there is no obligation more important than supporting one's minor child. See, *e.g.*, *McLauchlan*, 2012 IL App (1st) 102114, ¶ 26. The absolute nature of the obligation continues until the child becomes emancipated, unless otherwise provided by statute or court order, or unless the parties agree to extend it. *Finley v. Finley*, 81 Ill. 2d 317, 326 (1980). When a person chooses to have a child later in life, he will likely enter retirement before the child becomes emancipated. When the parent has financial resources as great as those at issue here, he can support his child in a manner that both satisfies the child's material needs and

provides a continuity of lifestyle through the remainder of the child's dependency. A generous, but comparatively modest, child-support obligation should not be reduced in favor of the parent's truly lavish and entirely optional personal expenditures. Specifically, a $36,000-per-year child-support obligation should not be reduced in favor of a $60,000 annual travel budget enjoyed primarily by the parent and his new wife, $40,000 in gifts to adult family members, and a $775,000 second home that carries a sizable mortgage.

¶ 91　As we have stated, M.H.'s material needs have increased due to medical issues and his growth from a young child to an early adolescent. As Michael conceded M.H.'s increased needs and Cherie's temporary unemployment in his pleading, we do not detail these points in this portion of our analysis. Rather, the alleged substantial change in this case is Michael's retirement status, and we focus on that.

¶ 92　Michael's income has likely decreased, like the husband's in *Schrimpf* and as is typical in retirement. However, it is not as low as the trial court estimated. To the contrary, it was, at a minimum, $128,000, carrying a $2133-per-month guideline support amount, even under the most conservative estimates in the record. This does not account for any of the $400,000 in withdrawn retirement funds. Even if the court had allocated a small portion of the withdrawal as income, Michael's net income could have been $180,000, the amount upon which the $3043 monthly award was based. Because Michael's retirement was in good faith, we do not impute additional income.

¶ 93　Michael's lifestyle has not decreased. In retirement, Michael has continued to live as though his net income is at least $180,000. In fact, in 2016, he spent substantially more than that amount. He spent $79,200 running his households, including a significant mortgage on a vacation home, real estate taxes, and utilities (according to his own financial statement); $13,900

on personal and miscellaneous expenses such as clothing, medical costs, and social clubs and obligations (according to his own affidavit, and minus the false representation of $400 per month on travel and gifts); $60,000 on travel (uncontested); $40,000 on gifts to adult family members (uncontested, and not counting the $30,000 in gifts that Michael characterized as informal loans); and $36,000 on child support (uncontested). In spending an uncontested $229,100, he certainly lived as though he made $180,000. Also, it is undisputed that Michael withdrew $400,000 from either an IRA or an annuity and that he used $129,000 of this to sustain his lifestyle. Therefore, the trial court's statement that "there was no evidence that [Michael] was living off his assets" was incorrect. Rather, Michael's spending patterns show the power of his capital and demonstrate that there has been no change in his financial circumstances to warrant a reduction in his support.

¶ 94    Michael argues that records of his 2016 financial activity are not reliable indicators of his 2017 lifestyle. To this, we note that these are the only records we have. The trial court could not rely on Michael's conclusory representation that he plans to spend less in the future. This could not satisfy Michael's burden of proof. As the petitioner, Michael had the burden to prove that his financial circumstances have changed so as to warrant a reduction in child support; nevertheless, he presented no documentation of lower spending. To the contrary, his January and February 2017 credit card statements show no reduction in spending patterns. Also, the last time Michael represented to the court that he planned to reduce his spending, in his December 2015 financial statement, he most definitely did not. There, stating that his severance had ended (aside from deferred compensation) and seeking to reduce child support, he represented that he would spend $200 per month on travel and $200 per month on gifts. Instead, he spent $5000 per month on travel and $3333 per month on gifts over the next 12 months. Nothing changed for

Michael from December 2015 to April 2017. Throughout that time, he was retired and his severance had ended (aside from deferred compensation). Thus, there is no evidence to support that, when Michael again informs the court that his severance has ended and he intends to spend $200 per month on travel and $200 per month on gifts, he will do so.

¶ 95    Michael also argues that expenditures are not income. However, the point is not that expenditures *are* income. Rather, the point is that expenditures are *evidence of* income, resources, and lifestyle. Without question, Michael's retirement lifestyle demonstrates his continued ability to meet his existing obligation.

¶ 96    Even more compelling than Michael's lifestyle are the funds supporting it. Entering retirement, Michael had $2.8 million in his brokerage accounts. Despite withdrawing $400,000 in retirement funds in 2016, his accounts fell in value by only $215,000 in 2016, to $2.585 million. This indicates that the value of the accounts continued to grow passively by $185,000 in less than one year, whether Michael chose to withdraw the gains or not. Michael can access retirement funds without penalty as he chooses. He also owns the Oswego investment property, which he paid for with $161,000 in cash.

¶ 97    Lastly, Michael's financial security in retirement will not be jeopardized by drawing upon his retirement funds and other assets to fulfill his existing child-support obligation. Michael, at age 64, has put forth no evidence of his own health needs. The record shows that he is able to meet the physical demands of near-constant travel. As of the beginning of 2017, M.H. had approximately six years of dependency remaining. Each year of full payment represents less than 1.5% of the total value of Michael's brokerage assets ($36,516 is less than 1.5% of $2.585 million). The disputed portion of one year of payments represents 0.6% of the total value of Michael's brokerage assets ($36,516 – ($1700 x 12) is $16,116, which is approximately 0.6% of

$2.585 million). The record shows these accounts to have grown by a far higher percentage, more than 7%, in less than one year, whether Michael chooses to draw upon the growth or not ($185,000 is more than 7% of $2.585 million). Each year of full payment constitutes less than 20% of the portfolio's growth ($36,516 is less than 20% of $185,000). The disputed portion constitutes less than 9% of the portfolio's growth ($16,116 is less than 9% of $185,000). In other words, in the snapshot of time presented, and setting the issue of taxes aside, Michael was being asked to use 20% of his portfolio's growth to pay child support, without ever dipping into the principal of his vast retirement assets and while being able to reinvest the remaining 80% of the growth. Payment of the full support amount, even if paid through the withdrawal of funds alone, would not lead to the depletion of assets. No rational person would conclude that payment of the full support amount would jeopardize Michael's financial security in retirement.

¶ 98    In light of these factors, the evidence does not support that Michael suffered a substantial change in his financial resources that decreased his ability to satisfy the full support amount. Because we have held that there was no substantial change in circumstances to warrant a reduction in child support, our analysis could end here. However, we choose to explain why, even if Michael's retirement constituted a substantial change in circumstances, the statutory factors support the $3043 award.

¶ 99              C. The Statutory Factors Support the Original $3043 Award

¶ 100   The first step in setting the support amount is determining the supporting parent's net income. As we have discussed, Michael's net income is, at a minimum, $128,000, with a 20% guideline support amount of $2133 per month. If even a small portion of the $400,000 withdrawal can be categorized as net income, we are at the original $180,000 net income

amount, upon which the $3043, 20% guideline award was based. Again, no further analysis is needed.

¶ 101   Even if the $400,000 withdrawal cannot be categorized as income, we still must consider whether the statutory factors unquestionably warrant an upward deviation from the guideline amount. Here, the statutory factors call for an upward deviation. We consider the needs of M.H. and the financial resources of Cherie and Michael. Upon review of each of these factors, we conclude that the trial court erred in its analysis and abused its discretion.

¶ 102                                      1. The Needs of M.H.

¶ 103   First, we consider the educational, physical, mental, and emotional needs of M.H., as well as the standard of living M.H. would have enjoyed had the marriage not been dissolved. As to this factor, the court determined that costs exclusive to M.H. were $3435 and that this amount was more than sufficient to meet M.H.'s needs. Its $1700 support order essentially split the burden of the costs exclusive to M.H. This contribution is insufficient when one considers that Michael's effective share of M.H.'s ordinary medical expenses will account for $500 of that amount and leave just $1200 per month to contribute to M.H.'s other needs. Moreover, M.H.'s other needs include more than those costs exclusive to him, and the court erred when it considered only those costs.

¶ 104   Child support is not limited to the child's demonstrated needs. *In re Marriage of Osborn*, 206 Ill. App. 3d 588, 604 (1990). Rather, the court may issue an award in excess of the child's needs or in deviation from the guideline amount, if it is necessary to enable the child to enjoy the standard of living he would have enjoyed had the marriage not been dissolved. *Id.* Even more to the point, the court *must* consider expenses beyond those exclusive to the child, such as household and transportation expenses from which the child benefits. *I.I.*, 2016 IL App (1st)

160071, ¶ 54. In *I.I.*, the court ordered that the noncustodial father contribute $3000 per month to support the child. It acknowledged that expenses exclusive to the child were only $1500 per month. However, household expenses were $1900 per month and transportation expenses were $500 per month. The court explained:

> "Child support is intended to 'provide for the reasonable and necessary educational, physical, mental and emotional health needs of the child.' [Citation] A child is not expected to live without a roof over his head or with no way to travel from place to place. Thus, even based on the disclosure alone, the expenses eligible for child support would include more than the $1497 asserted by respondent." *Id.*

¶ 105 Here, the lifestyle that M.H. would have enjoyed had the parties stayed married certainly would have included the option of a middle-class family home in an affluent suburb (if not its big-city equivalent). Per Cherie's testimony, that is exactly what she provided for her son. First, she provided a family home in Glen Ellyn. She sold that home in 2016. Hoping to buy into the Naperville school district, Cherie was currently renting a home for $2900 per month in Lisle. On top of rent, she incurs lawn-care costs and utilities. The home is big enough to host her mother more than two-thirds of the year, who helps care for M.H. Cherie pays her mother a nominal $100 per month. Cherie's mother owns her own home in Michigan, so the housing is not a windfall to her. To the contrary, allowing M.H., an only child, to have his grandmother in the home while his mother works necessarily adds warmth, companionship, and loving supervision to his childhood experience. Thus, while the parties might have agreed to $3435 in expenses exclusive to M.H., the court must also consider the costs of running a comfortable household, from which M.H. benefits. Cherie, the residential custodian, incurs over $5000 in costs to run

her household, including groceries and transportation costs, and the court erred in failing to consider any of these costs.

¶ 106                                  2. Cherie's Financial Resources

¶ 107   Next, we turn to the financial resources of the custodial and noncustodial parents.  We begin with the custodial parent, Cherie.  Cherie earns $135,000 per year and the record indicates that her highest income has been $150,000 per year.  Cherie does not receive maintenance, and no spouse contributes to her household income.  She has also endured 20 months of unemployment, during which time she did not seek to increase child support but, rather, lived off of her savings.

¶ 108   The court determined that Cherie's income had substantially increased.  She earns $135,000 per year, but she chose to remain unemployed for 20 months: "Cherie intentionally did not seek employment, because she wanted to focus on the needs of M.H."  Further, the court stated that Cherie traveled extensively and extravagantly with M.H. and had assets of approximately $1 million.  Aside from an accurate statement of Cherie's salary, the court's characterizations are not supported by the evidence.  Thus, the court's conclusion that Cherie and Michael are equally situated so as to bear an equal burden in supporting M.H. is erroneous.

¶ 109   The record refutes that Cherie's income had substantially increased since the last support order.  In 2010, she earned $145,000.  In 2017, she earned $135,000.  Also, the record refutes that Cherie did not seek employment.  Rather, Cherie testified that she *did* seek employment but was selective because M.H. was her first priority: "Well, I was looking for an opportunity, but [M.H.] was a child that was in pretty big distress [due to his behavioral diagnoses], [and M.H. was traveling 45 minutes each day to reach a school that met his needs], *** so I looked for things that could get him through, and I could be able to care for [M.H.] during that time.  But I

used my savings and things like that to subsidize my income, and [I could afford to be discerning because I had saved for a time like this]." Indeed, Cherie was M.H.'s primary caregiver, and Michael's credit card statements showed him to be traveling to different locations around the world during Cherie's period of unemployment.

¶ 110 On the topic of travel, nothing in the record supports the trial court's finding that Cherie traveled extensively and extravagantly with M.H. Cherie testified without contradiction that she went on one nice vacation per year. She always took M.H. Most recently, they went to an all-inclusive resort in the Bahamas, which cost $5000. In the past 12 years, Cherie has also gone to the Caribbean (2014), Alaska (2008), Italy (date unclear), and Salt Lake City (date unclear). Taking five notable vacations in 12 years is fortunate, but it cannot be called extravagant. This is in keeping with the lifestyle M.H. would have enjoyed had the parties not dissolved their marriage. It is Michael who traveled extensively and extravagantly, though generally without M.H.

¶ 111 Finally, we put into context the trial court's statement that Cherie had $1 million in assets. Approximately $860,000 of this is held in retirement accounts that cannot be accessed without penalty. An additional $145,000 is held in a checking account to be used as a down-payment on a home. Cherie does not have the liquidity that Michael enjoys. Cherie does not own a home, and she owns one car valued at $11,000. While Cherie earns a comfortable $135,000 per year, every dollar of her budget is accounted for in a predictable, responsible, and nonextravagant manner.

¶ 112                           3. Michael's Financial Resources

¶ 113 We next turn to the financial resources of the noncustodial parent, Michael. Unlike Cherie, Michael's finances are not straightforward, and we have discussed Michael's finances at

length elsewhere in our analysis. We recap, however, that prior to retiring, Michael had a decade-long history of earning in the range of $500,000-plus per year. Entering retirement, Michael had $2.8 million in his brokerage accounts. Despite withdrawing $400,000 in retirement funds in 2016, his accounts fell in value by only $215,000 in 2016, to $2.585 million, indicating that the value of the accounts continued to grow passively by $185,000 in less than one year. He can access these funds without penalty as he chooses. Michael also owns three homes and two cars. Michael spent at a rate of $230,000 per year in the months preceding the hearing, including $60,000 per year on travel and $40,000 per year on gifts.

¶ 114 Indeed, Michael lives extravagantly. However, contrary to the trial court's statement, Michael does not travel extensively and extravagantly with M.H. He took M.H. to Washington D.C., as an educational trip; to Florida to visit M.H.'s half-brother; and to Montana, where he lived for much of the year, thus constituting a hybrid between travel and ordinary visitation. No reasonable person would characterize as extravagant Michael's domestic travel with M.H. to visit family and to spend time at his residence.

¶ 115 As a final point, we note that the trial court demonstrated that it misunderstood the effect that maintaining the $3043 support amount would have on Michael's security in retirement. The trial court rejected Cherie's position that Michael should draw upon his $2.5 million in assets, and the interest earned from it, in order to keep the child support at $3043 per month. The court stated:

"Assuming [Michael's] income is now only $78,000 per year, Michael would be required to draw down his assets in the amount of $193,000 per year in order to equal the $271,000 annual income upon which child support was based. Assuming he lives for another 20 years, till age 84, this would require a sum of $3,860,000. Michael does not

have this sum available. In addition, it would assume that Michael wants to leave $0 in his estate for his heirs. To require, or to impute to someone the requirement that they regularly draw on their assets until liquidated, when they are not actually currently engaged in doing that, is speculative and not supported by the facts."

The court's logic is flawed and greatly exaggerates Michael's purported burden. First, withdrawing money typically has a net value, and the court is working in gross values. Second, the withdrawal amount need not bring Michael to a total that would result in a guideline amount of $3043. Cherie's point in this portion of her argument was that the court should deviate upward from the guideline amount. Third, keeping child support at $3043 will not require Michael to liquidate $2.5 million in assets to $0. Paying $3043 per month, as opposed to $1700 per month, is a difference of $16,116 per year. Paying $3043 per month, as opposed to $2133, the true guideline amount after accounting for the forgotten $83,000 in deferred compensation, is a difference of $10,916 per year. That is the amount that Michael would withdraw, not $193,000. Fourth, the value of the accounts is not static. Withdrawing $10,916 per year will not cause the accounts to lose value by $10,916 per year. In 2016, Michael withdrew $400,000, but the accounts lost only $215,000 in value. Fifth, the $10,916 withdrawal will not continue for 20 years. The question is not how much longer Michael will live but how much longer he will be obligated to pay child support. M.H. was 12 or 13 years old in 2017, and the original judgment of dissolution mandated that payments "in no event" continue beyond age 19. Withdrawing $10,916 in the first year, and $16,116 per year after the deferred compensation ends, equates to $107,612 over six years against accounts that have generated six-figure growth in less than one year. The court's understanding of Michael's financial resources, and of the impact that full

payment of his child-support obligation would have on those financial resources, is, again, flawed.

¶ 116                                    III. CONCLUSION

¶ 117   Contrary to the trial court's assessment, and as we have stated, well-funded retirement accounts are meant to finance one's life, and existing obligations are part of one's life. Traditional earned income is expected to be lower in retirement, but this should not result in a presumption that there has been a substantial change in economic fortune resulting in a decreased ability to pay child support. Just as income decreases, a countervailing shift in financial goals occurs. The focus shifts from work, traditional income, and savings to passive income, passive growth, and measured withdrawals. The petitioner must prove, based on his unique circumstances, that his financial position in retirement renders him less able to pay the full support amount. Michael failed to do so. Because the trial court abused its discretion in modifying the support amount, we need not consider whether any modification should be applied retroactively.

¶ 118   For the reasons stated, the judgment of the circuit court of Du Page County is reversed and the 2010 award of child support is reinstated.

¶ 119   Reversed.