2020 IL App (2d) 191117-U
No. 2-19-1117
Order filed August 7, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF JACQUELINE M. LESCH, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Petitioner-Appellee, | ) ) | |
| and | ) ) | No. 17-MR-0132 |
| BRIAN W. LESCH, | ) ) ) | Honorable Karen M. Wilson, |
| Respondent-Appellant. | ) | Judge, Presiding. |

JUSTICE BRIDGES delivered the judgment of the court.
Justices Jorgensen and Brennan concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court applied the proper statute when it modified the parties' parenting schedule; the trial court's modification was not against the manifest weight of the evidence; and the trial court did not err when it denied respondent's motion to strike petitioner's closing argument. We affirm.

¶ 2   Respondent, Brian W. Lesch, appeals the trial court's modification of the parties' parenting schedule for their two minor children, as well as the trial court's denial of his petition to strike petitioner, Jacqueline M. Lesch's, closing argument. Brian raises four issues on appeal. He maintains that the trial court's reduction in his parenting time constitutes a restriction under section 603.10 of the Illinois Marriage and Dissolution of Marriage Act (the Act) (750 ILCS 5/603.10

(West 2018)) rather than a modification under section 610.5 of the Act (750 ILCS 5/610.5 (West 2018)), and that there was insufficient evidence to support such a restriction. He argues that there was insufficient evidence of a substantial change in circumstances justifying a reduction in his parenting time, and that the trial court's modification was not in the children's best interest. He also argues that the trial court erred in denying his motion to strike Jacqueline's written closing argument pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2018)) for containing citations to orders issued pursuant to Illinois Supreme Court Rule 23 (eff. Apr. 1, 2018). We affirm.

¶ 3                                I. BACKGROUND

¶ 4      Brian and Jacqueline were married on November 26, 2004. They had two children, J.L., born February 21, 2006, and I.L., born September 18, 2008. On March 30, 2009, Jacqueline filed a petition for dissolution of marriage in Kane County, Illinois. On November 19, 2010, a judgment for the dissolution of marriage was entered incorporating a marital settlement agreement and a joint parenting agreement. At the time, the children were ages four and two.

¶ 5      Pursuant to the marital settlement agreement, the parties would have joint custody of the children, and pursuant to the joint parenting agreement, Brian would have the children "whenever he [was] not working," including holidays with the exception of Mother's Day. Jacqueline would have the children the rest of the time. Brian's schedule at the time was a continuous cycle of six days working and two days off. The parties would also have two weeks of vacation time with the children. The joint parenting agreement also stated that if Brian's work schedule changed, the parties agreed to review the agreement and make adjustments, first submitting a written proposal to the other party, and then proceeding to mediation before pursuing a remedy in court.

¶ 6      In March 2017, Brian's employment schedule changed. His new schedule was two days

working, two days off, three days working, two days off, three days working, two days off, four days working, and three days off. This averaged out to three days off per week, as opposed to the previous two days off every eight days. After failing to reach an agreement regarding Brian's new schedule, Jacqueline filed a motion to set parenting schedule on July 13, 2017. Jacqueline's motion cited to several changes in circumstances including Brian's work schedule; the fact that the children were now older; Brian had remarried and now lived in a two bedroom apartment with his new wife, Heather Lesch, and her two children, resulting in J.L. and I.L. sharing a single bedroom with Heather's children; J.L. had developed a medical condition which caused her to experience bedwetting and made her embarrassed to share a bedroom; J.L. had developed anxiety for which she was receiving medication and seeing a therapist; J.L. complained about stomachaches; and that both children would cry and beg Jacqueline not to take them to visit Brian.

¶ 7    The trial began on January 11, 2019, and continued on to January 18, 2019. At the time of trial, J.L. was nearly 13, and I.L. was 10. A neuropsychological examination was administered to both children. The parties agreed that they and the guardian *ad litem* would testify as to the examination results but that the reports would not be admitted as evidence.

¶ 8    At trial, the guardian *ad litem* testified as follows. In her role as guardian *ad litem*, she had formally interviewed the parties. She performed site visits at Brian's apartment and at his new house. She interviewed the children three times each, once in person and twice by phone. She had interviewed the therapist two times. She had also participated in settlement conferences with both counsels.

¶ 9    The guardian *ad litem* found J.L. to be "a very lovely young lady; very upset ***, very weepy" and very young emotionally. J.L. also had a medical condition, which led to her not being

able to control her bladder, and this was of great concern to J.L. J.L. was "doing okay in school," but she suffered from anxiety and ADHD.

¶ 10    The therapist told the guardian *ad litem* that J.L. was extremely sensitive.[1] The therapist found that J.L. was struggling with the parenting schedule and, that the main issue was the "toxic relationship" between J.L. and Brian's wife, Heather. The therapist indicated that J.L. believed that Heather was nasty to her and that she did not feel that Brian was on her side emotionally.

¶ 11    J.L. told the guardian *ad litem* that she got in trouble a lot at her dad's house and was constantly grounded. She would be punished by having electronics taken away, which included not being allowed in a room with electronics. When Brian lived in his apartment, this meant that she would have to stay in the kitchen because the TV was in the front room. J.L. felt like she was being punished because Heather did not like her.

¶ 12    With regard to I.L., the therapist reported less concern. The guardian *ad litem* testified she initially found him to be a "happy-go-lucky kid" who loved being at his dad's house and did not understand what J.L.'s issues were. However, over the previous year, I.L. had become progressively more unhappy, and when pressed did not give any specific reasons why, saying things like he did not want to be there anymore or that Heather was mean to him. He also indicated that there was not enough to eat at Brian's house. The guardian *ad litem* was not sure whether there was an actual problem or if he was feeling slighted by everyone's concerns regarding J.L. She also noted that I.L. was diagnosed with ADD or ADHD. When the guardian *ad litem* asked J.L. about I.L., J.L. did not provide any further insight into I.L.'s change in attitude.

---

[1]Jacqueline filed a motion *in limine* seeking to bar the therapist's testimony, arguing that testifying might compromise the therapist's rapport with the family, so instead of the therapist testifying the guardian *ad litem* testified as to the therapist's recommendations.

¶ 13    With regard to Brian and Jacqueline, the guardian *ad litem* found them both to be friendly and reasonable people. She indicated that they were able to make joint decisions regarding medical care, education, extracurriculars, and religion, and that the focus of the controversy between the two was the parenting schedule.

¶ 14    When asked about changes in the family's circumstances since the time of the original parenting schedule was set, the guardian *ad litem* indicated that the children's age was the most obvious change. The children were now in school and reaching a point in their lives where their peer group relationships mattered more. She also indicated that Brian's work schedule had changed.

¶ 15    With regard to a proposed parenting schedule, when the guardian *ad litem* asked J.L. what she wanted with regard to a parenting schedule, she indicated that she wanted more one-on-one time with her dad and with her mom. I.L. initially indicated that he was happy with the current schedule but later said he was at his dad's house too much.

¶ 16    The guardian *ad litem* stated she had spoken with the therapist who indicated that her primary concern going into the trial was the "toxic relationship" between J.L. and Heather. The therapist did not believe it would be in J.L.'s best interest to increase the amount of time spent with Brian and that modifying or reducing the time with Brian would be a good idea. She did not indicate any significant concerns regarding I.L.

¶ 17    The guardian *ad litem's* recommendation regarding parenting time was that Brian have the children overnight on his days off every other week, and the week he did not have the children overnight, Brian would have dinner with each child individually once a week. She believed that this struck a balance between increased stability for the children's schedule and frequent contact with Brian while also giving the children the one-on-one time requested by J.L. She also

recommended rotating holidays and two to three weeks of vacation for each parent during the summer.

¶ 18    Jacqueline testified as follows. She was employed as a content analyst at Ace Hardware. She had the same job since the divorce was finalized in 2010. She worked Monday through Friday, and her work started between 7:30 and 8:30 a.m. and ended between 3:30 and 4:30 p.m. depending on what activities the children had that day. School started at 8:20, and in order for her to get to work on time, she often dropped the children off at a before-school program. The children usually got up at 6:30, sometimes 5:30. After school the children attended an afterschool care program. On Mondays, J.L. attended her individual and group therapies, and Jacqueline's parents picked up the children and fed them dinner when they were not with Brian. On Tuesdays, the children had basketball practice.

¶ 19    Jacqueline testified that J.L. was insecure about sleeping over at friends' houses due to her urinary problems, fearing that she may have an accident in their homes, and that she was more comfortable having sleepovers at Jacqueline's house where any accident could be discretely dealt with. She also testified to the measures taken to address any accidents at school or extracurricular activities. Additionally, J.L.'s ADHD meant that she had to be reminded several times to do things like brush her teeth or put her clothes in a hamper. Further, because J.L. was on the autism spectrum, she was very "touchy feely and affectionate" which made it difficult for her to make friends. J.L. was attending group therapy to try to address her socialization difficulties. J.L. also attended individual therapy. In addition to taking an anti-depressant, J.L. received medication for her ADHD and anxiety as well as an acid reducer and allergy medicine. For a while J.L. had been experiencing stomachaches, which were attributed to her anxiety. She also had been suffering

migraines for which she saw a neurologist, but those had subsided. J.L. also had learning disabilities, which required her to spend additional time on her schoolwork.

¶ 20    Regarding I.L., Jacqueline testified that he was generally a happy child but that he experienced mood swings and anger. She originally believed that this might have been caused by his ADHD, but after receiving treatment, the issues remained. She could not identify a source for I.L.'s demeanor, and his explanations were vague. She found that physical activity helped him to work through his mood swings. She also found that when disciplining him, it was best to speak to him like an adult rather than yelling. Due to his ADHD medicine, I.L. has a diminished appetite and was somewhat underweight. It had been difficult to get him to eat sometimes. Jacqueline stated in between the first and second days of the trial, I.L. had written in a school assignment that he wanted to run away, for which Brian scheduled an appointment with I.L.'s therapist to address.

¶ 21    Jacqueline testified that she and Brian were generally able to agree on the children's medical treatment, education, extracurricular activities, and religion. She also indicated that she and Brian had been attending counseling to help coordinate schedules, chores, and discipline. Heather had not been at these meetings, but she was willing to work with her as well.

¶ 22    With regard to changes in circumstances since the divorce, Jacqueline testified that the children were both older and had significantly different needs than when they were younger. While she lived in the same townhouse since the divorce, Brian had moved from his mother's home in Lombard to Heather's apartment in Villa Park and then to his current home in Aurora. Additionally, Brian's schedule had changed, such that there was less time between visits leading to the children going back and forth more often, which made it difficult for the children to do things with their friends or to attend activities.

¶ 23    With respect to vacation, Jacqueline suggested that she have the children for the week of the Fourth of July to attend an annual camping trip in Wisconsin and that Brian have the children for spring break. The parties would also have fourteen days in the summer for vacation with the children.

¶ 24    With respect to parenting time, Jacqueline suggested that Brian have the children for two consecutive days with one overnight stay every other week, with one-on-one time with each child on the alternate weeks. Jacqueline testified that she would prefer that the children spend time with a nanny or her parents instead of Brian during her scheduled parenting time if she was unavailable.

¶ 25    Brian testified as follows. His work schedule was on a three-week rotation which was set at the end of the previous year. He spent two days working, two days off, three days working, two days off, three days working, two days off, four days working, and three days off. As such, he did not have the same days off from week to week. Because of this, he had to work on some holidays. On the days he worked, he started at 7:00 a.m. and ended at 5:00 p.m. He rarely had to work overtime. He received six weeks' vacation each year.

¶ 26    Brian agreed that he and Jacqueline were able to make joint decisions with regard to the children's medical treatment, education, religion, and extracurricular activities, with the only major problem being the parenting schedule. Brian and Jacqueline had been working with a counselor to coordinate their disciplining of the children. Jacqueline had recently begun disciplining the children because she realized that not doing so had led to problems. Brian felt that this was a good change because he had been the only disciplinarian up until that point. He also believed that his discipline had helped with J.L.'s behavior.

¶ 27    Brian testified that the children had toys at his house. When he was with I.L. they played computer games, basketball, and rode bikes. With J.L. they did crafts, played board games, played

computer games, and rode bikes. He also got a discount to Glendale Heights facilities and was planning on getting an Aurora pool pass.

¶ 28   With regard to J.L., Brian testified that she had been experiencing stomachaches, that were caused by changes in her medication, and she no longer had them. He also testified that due to her learning disabilities it was more difficult for her to read and spell, so she needed extra time to do her work. He said J.L.'s teacher would give J.L. her homework in advance, and on the weekends, they would spend the majority of their time on homework trying to get J.L. caught up. He had also been working with J.L. to help her understand social boundaries, like that she could not play with the neighbor's dog while he had guests over, or not making her friends uncomfortable by grabbing and hugging them. He said J.L. would also play him and Heather against one another and did not have a good relationship with Heather's son.

¶ 29   Regarding I.L., Brian only stated he had been helping him through some sensory issues.

¶ 30   With regard to the parenting schedule, Brian indicated that he would like to have the children as much as possible but was willing to compromise and let Jacqueline have the children at least two weekends of the month regardless of his schedule. Because he did not have to work on the days he had the children, he was able to spend more time with them on their homework and did not need to drop them off at school or wake them up as early. He was also able to pick them up directly from school and get them started on their homework earlier. He would occasionally bring the children to before-school care if there was homework he was unable to help with. He feared that the children's grades would slip if they spent less time with him. As to vacations, he was willing to let Jacqueline have the children for any holidays he did not have off, since he often had to work holidays. He also felt that he should have the children for spring break to offset the holidays he had to work.

¶ 31    Heather testified as follows. She had two children from a previous relationship aged 16 and 18 at the time of trial. They both lived at home with Brian and Heather. She stated that she had a good relationship with J.L. and I.L. in that she played games with them helped J.L. with cooking and gardening, and they did crafts together. She had participated in one counseling session and was willing to participate further if asked. She said in the beginning of her relationship with the children, there were difficulties with discipline and following the household rules, more so with J.L. than with I.L. For example, J.L. once tied up a neighbor boy with yarn. Heather admitted to losing her temper once and telling J.L. to "ask her fucking father," and Heather regretted it. She also stated that J.L. had tried to play Brian and her against one another.

¶ 32    At the close of trial, the court instructed the parties to submit written closing arguments. Jacqueline's closing argument contained citations to two unpublished Rule 23 orders. Brian filed a motion to strike, and Jacqueline filed a motion to file an amended closing argument. The trial court denied both motions, awarded Brian $1,000 in attorneys fees, and indicated that it would take no notice of any unpublished cases or arguments stemming from them.

¶ 33    On May 17, 2019, the trial court entered a judgment assigning Brian parenting time every other week on two consecutive non-working days. During the weeks he did not have the children overnight, Brian would spend one night a week having dinner or in some other activity alone with one of the children while Jacqueline did the same with the other child, rotating which child he had dinner with. Each parent would have fourteen days of vacation time. Brian would also have parenting time during spring break. Additionally, each parent would split parenting time equally over winter break. The Court also assigned parenting time to Jacqueline on the Fourth of July and assigned other major holidays to each parent on a rotating basis. Brian filed a motion to reconsider, which was denied. However, at the hearing on the motion to reconsider, the parties agreed that on

any of Brian's scheduled holidays where he had to work, he would be allowed an additional alternative day to celebrate with the children.

¶ 34     Brian timely appealed.[2]

¶ 35                              II. ANALYSIS

¶ 36     Brian maintains that the substantial reduction in his parenting time acts as a restriction rather than a modification; that there was not a substantial change in circumstances to support modifying the original parenting agreement; that the trial court's decision to reduce Brian's parenting time was not in the best interest of the children; and that the court erred in denying his motion to strike Jacqueline's closing argument.

¶ 37               A. Trial Court's Judgment was not a Restriction under Section 603.10

¶ 38     Brian contends that the trial court's reduction of his parenting time with the children constitutes a restriction of his parenting time under section 603.10 of the Act rather than a modification under section 610.5 of the Act. 750 ILCS 5/603.10, 610.5 (West 2018). Whether the trial court applied the correct statutory provision is a matter of statutory interpretation which is reviewed *de novo*. *Sadler v. Service*, 406 Ill. App. 3d 1063, 1065 (2011).

---

[2] Appellant sought and was granted an extension in the briefing scheduled on February 6, 2020, and then again on May 14, 2020. These delays meant that Appellant's reply brief was not received until June 2, 2020, after the May 21, 2020, deadline. This delay is attributable to Appellant and constitutes good cause for issuing our decision after the 150-day deadline under Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018). Once, all briefs were received, the disposition was filed as expeditiously as possible.

¶ 39    "[T]he difference between a modification and a restriction *** is that a modification looks at the child's best interests directly, while a restriction looks at the suitability of the parent whose visitation would be curtailed. *** [I]t is not the result—the actual change in visitation—that distinguishes a restriction from a modification; it is the purpose for the change." *In re Marriage of Chehaiber*, 394 Ill. App. 3d 690, 697 (2009) (discussing a previous version of the Act). Brian argues that the reduction in his parenting time was not a modification but rather a restriction because it was based not on the best interests of the children but rather on Brian's deficiencies, particularly, the "toxic relationship" between Heather and J.L.

¶ 40    The trial court's judgment provides little to no insight into precisely what factors the court considered in reaching its decision. However, the trial court's remarks at the hearing on Brian's motion to reconsider shed some light on the rationale behind its decision. At the hearing, the trial court remarked that, "[T]hese are two very unique children that require a lot of attention and care, and they get that from both of their parents. And I was impressed by how both parents care for the children." The court indicated that it had immense respect for the guardian *ad litem's* recommendations as to what was in the children's best interests. The trial court also emphasized that the children's lives had changed and that those changes meant that the children needed continuity and a schedule. While it is true that the guardian *ad litem* testified that one of the therapist's main concerns was J.L.'s "toxic relationship" with Heather, at trial the guardian *ad litem* indicated that her recommended parenting schedule was based on providing predictability and stability for the children.

¶ 41    As such, while the trial court's judgment resulted in a significant reduction in Brian's parenting time, the trial court's primary motivation behind its determination appears to have been based on what it thought was in the best interests of the children, rather than any deficiency with

Brian. Accordingly, the trial court's judgment was not a restriction, and the trial court applied the correct statute.

¶ 42          B. Modification was not Against the Manifest Weight of the Evidence

¶ 43    Brian maintains that the trial court erred when it determined that there was a substantial change in circumstances justifying a modification of the parenting schedule and that the modification was not in the children's best interests. "[T]he court shall modify a parenting plan or allocation judgment when necessary to serve the child's best interests if the court finds, by a preponderance of the evidence, that on the basis of facts that have arisen since the entry of the existing parenting plan or allocation judgment or were not anticipated therein, a substantial change has occurred in the circumstances of the child or of either parent and that a modification is necessary to serve the child's best interests." 750 ILCS 5/610.5 (West 2018). The standard of review for a trial court's modification of a parenting plan is whether the modification is against the manifest weight of the evidence or an abuse of discretion. *In re Marriage of Debra N. & Michael S.*, 2013 IL App (1st) 122145, ¶ 45. Brian does not argue that the trial court abused its discretion. "A decision is against the manifest weight of the evidence when an opposite conclusion is apparent or when the court's findings appear to be unreasonable, arbitrary, or not based on evidence." *In re Marriage of Verhines & Hickey*, 2018 IL App (2d) 171034, ¶ 51. "A reviewing court may not overturn a judgment merely because the reviewing court might disagree with the judgment, or, had the reviewing court been the trier of fact, might have come to a different conclusion." *People v. Parcel of Prop. Commonly Known as 1945 N. 31st St., Decatur, Macon County, Illinois*, 217 Ill. 2d 481, 510 (2005).

¶ 44                    1. Substantial Change in Circumstances

¶ 45    Brian argues that there is no evidence that the changes in circumstances identified at trial adversely affected the welfare of the children. Brian maintains that apart from limited testimony regarding J.L.'s peer relationships, there was no evidence that his work schedule adversely affected the children's school, projects, or trips. Brian also maintains that although his work schedule rotated, he received his work and vacation schedule in December for the following year. So, his work schedule was predictable and stable.

¶ 46    Brian's arguments appear to focus on whether the identified changes in circumstances justified modification rather than if substantial changes existed. We conclude that the evidence clearly demonstrated that there were substantial changes in the circumstances in this case. The children were no longer toddlers, but pre-teens who were attending school. Both children had been diagnosed as being on the autism spectrum, both were diagnosed with ADHD, and both were taking antidepressants. J.L. had developed a bladder control problem, was being treated for anxiety, and had been diagnosed with a learning disability. Brian now had additional time off (three out of every seven days as opposed to two out of every eight) as well as additional vacation time. Brian had re-married and moved to an apartment and subsequently a new home with Heather and her two children. Taken together, these changes support a finding that there was a substantial change in circumstances. It should also be noted that the original joint parenting agreement anticipated that Brian's schedule might change, requiring modification of the agreement. Section L of the agreement states in the pertinent part, "In the event that [Brian's] work schedule changes, the parties agree to review this Joint Parenting Agreement and make adjustments to this visitation agreement."

¶ 47                    2. Best Interest of the Children

¶ 48    The Act sets forth factors for the trial court to consider when determining the child's best

interests for the purposes of allocating parenting time, which are as follows:

"(1) the wishes of each parent seeking parenting time;

(2) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to parenting time;

(3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities or, if the child is under 2 years of age, since the child's birth;

(4) any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child;

(5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests;

(6) the child's adjustment to his or her home, school, and community;

(7) the mental and physical health of all individuals involved;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on parenting time is appropriate;

(11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household;

(12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs;

(13) the willingness and ability of each parent to facilitate and encourage a close

and continuing relationship between the other parent and the child;

(14) the occurrence of abuse against the child or other member of the child's household;

(15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender and, if so, the exact nature of the offense and what if any treatment the offender has successfully participated in; the parties are entitled to a hearing on the issues raised in this paragraph (15);

(16) the terms of a parent's military family-care plan that a parent must complete before deployment if a parent is a member of the United States Armed Forces who is being deployed; and

(17) any other factor that the court expressly finds to be relevant." 750 ILCS 5/602.7 (West 2018).

The trial court's judgment did not include an explanation as to how it applied these factors. However, a reviewing court can sustain the decision of the circuit court on any grounds which are called for by the record. *Rodriguez v. Sheriff's Merit Commission of Kane County*, 218 Ill. 2d 342, 357 (2006). We shall examine the evidence adduced at trial that we believe to be relevant to several of the factors.

¶ 49    With regard to the first factor, the guardian *ad litem* testified that Brian wanted to spend as much time with the children as possible, but that he had offered a schedule that would provide essentially the same amount of time as the original joint parenting agreement. Jacqueline's proposed plan was substantially similar to the one ordered by the trial court, with Brian having the children two days every other week with alternating one-on-one time with the children.

¶ 50    With regard to the second factor, the guardian *ad litem* testified that I.L. had expressed that

he was happy at Brian's house, but then later said that he was at Brian's house too much. The guardian *ad litem* also testified that J.L. wanted more one-on-one time with Brian and Jacqueline. Brian testified that I.L. had shown interest in spending time with him, and that J.L.'s preference would change depending on if she were in trouble.

¶ 51    With regard to the third factor, Brian's schedule changed in 2017. Between that time and the date of trial, Brian had the children on his days off, which on average was three out of every seven days. Brian testified that he helped the children with their homework when they were with him, dropped them off and picked them up from their school and activities, and spent time with the children.

¶ 52    With regard to the fourth factor, the original joint parenting agreement assigned Brian parenting time whenever he was off work. However, the agreement also specifically mentioned Brian's old schedule and indicated that a change in his schedule was a basis for adjusting the parenting schedule. Additionally, both parties had been able to agree on the children's education, medical treatment, and religious upbringing. The parties have also been attending counseling to help coordinate their parenting of the children.

¶ 53    With regard to the fifth factor, the only major point of contention regarding the children's relationships involved Heather. The therapist described her relationship with J.L. as toxic. Brian and Heather both testified that J.L. tried to play them against each other. Although Heather testified that she had good relationship with I.L. and J.L., Brian also testified that J.L. had trouble relating to Heather's son.

¶ 54    With regard to the sixth factor, J.L. had socialization issues that made it difficult to understand personal boundaries, and had trouble relating to her peers. She also suffered from anxiety, and Jacqueline testified that due to her urinary problem J.L. was reluctant to attend

sleepovers at her friends' houses, preferring to have her friends over instead. Additionally, due to J.L.'s learning disability, it took her a long time to do her homework, and her teacher gave her homework in advance. Additionally, based on the testimony, it is apparent that there were growing pains associated with Brian moving in with Heather and her children, particularly for J.L.

¶ 55     With regard to the seventh factor, it is evident that there were concerns regarding the mental health of the children. Both children were on the autism spectrum, both were taking antidepressants, and both had been diagnosed with ADHD. Some of these conditions and medications had caused physical side effects. I.L. had a low appetite and J.L. had suffered from headaches and stomachaches in the past. Additionally, I.L. has had mood swings with occasional feelings of anger.

¶ 56     With regard to the eighth factor, in addition to the children's medical and psychological needs, the guardian *ad litem* emphasized that based on her evaluation of the situation, the children needed "predictability, stability, and to be heard."

¶ 57     With regard to the ninth factor, Jacqueline lived about half an hour away from the children's school. Due to her work schedule, the children usually had to wake up around 6:30 to go to school, and sometimes as early as 5:30. With Brian the children did not need to get up as early, because he could take them directly to school. There was nothing in the record to indicate that there was any hardship in transporting the children to and from school or Brian and Jacqueline's residences.

¶ 58     With regard to factor 10, a restriction is appropriate when there is an issue with the suitability of one of the parents. *In re Marriage of Chehaiber*, 394 Ill. App. 3d 690, 697 (year). There is nothing in the record to indicate either parent is unsuitable to raise the children.

¶ 59     With regard to factor 12, the record demonstrates that both parents care deeply for the

children. The parents have attended counseling sessions to help them coordinate their parenting efforts, and there is nothing to indicate that either parent places their own needs ahead of the children's.

¶ 60    With regard to factor 13, the parties have generally demonstrated that they want the children to have a close relationship with each other. There is nothing in the record that indicates that either parent speaks ill of the other in front of the children.

¶ 61    With regard to factor 17, the trial court indicated that the guardian *ad litem's* recommendation played a major role in its decision.

¶ 62    When the evidence is considered in light of the statutory factors, it is not unreasonable to conclude that a modification was in the children's best interest. As the trial court stated in the hearing on Brian's motion to reconsider, "[T]hese are two very unique children that require a lot of attention and care[.]" The guardian *ad litem,* therapist, and trial judge all emphasized the importance of predictability and stability in the children's lives and to their overall psychological and emotional wellbeing. While there are advantages to spending time with Brian, such as not having to get up as early in the morning for school, his ability to work with the children on their homework, and in working through some of their social issues, it was not against the manifest weight of the evidence for the trial court to conclude that a more rigid and predictable schedule served the children's best interest.

¶ 63             C. Denial of Section 2-615 Motion to Strike was not Error

¶ 64    Last, Brian argues that the trial court erred in denying his motion to strike. The parties maintain that the trial court's denial of Brian's motion to strike should be reviewed *de novo*. We disagree. While a section 2-615 motion is typically reviewed *de novo* (*Reynolds v. Jimmy John's Enterprises, LLC*, 2013 IL App (4th) 120139, ¶ 25), the trial court's decision was essentially a

decision regarding the management of the case and as such is reviewed for an abuse of discretion. See *People v. Coleman*, 183 Ill. 2d 366, 387 (1998) (great deference is given to decisions of the trial judge in overseeing their courtroom or maintaining the progress of a trial). Jacqueline's closing argument cited two unpublished Rule 23 orders in support of her contention that there had been a substantial change in circumstances. In response Brian sought to have the entire closing argument stricken, and Jacqueline sought leave to file an amended closing argument deleting the citations. The trial court denied both motions, stating that it would not consider any Rule 23 orders or any arguments based on them.

¶ 65     An order entered under subpart (b) of Rule 23 is not precedential and may not be cited by any party except in narrowly defined circumstances. Ill. S. Ct. R. 23(e)(1) (eff. Apr. 1, 2018). Brian maintains that the trial court erred in denying his motion to strike, because the two Rule 23 orders were the only cases cited in Jacqueline's closing argument. We disagree. First, while it is true that Jacqueline's closing argument does not cite to other case law, it does cite to the Act. Second, the citations to Rule 23 orders are limited to two paragraphs of Jacqueline's 10-page closing argument, which mostly focuses on the evidence adduced at trial. Additionally, striking an entire brief due to isolated citations to a Rule 23 order is "wholly unjust" as it is sufficient merely to strike the particular references to the Rules 23 order. *Brinkley v. Brinkley*, 174 Ill. App. 3d 705, 715 (1988). Further still, a trial court may in its discretion opt not to strike a citation to a Rule 23 order and instead simply disregard it. See *In re S.F.*, 2020 IL App (2d) 190248, ¶ 16 (appellate court may in its discretion decline to strike a citation to a Rule 23 order and simply disregard it).

¶ 66     In this instance, the trial court properly determined that the citations to the Rule 23 orders in Jacqueline's closing argument were improper, but rather than strike the brief or have Jacqueline file an amended closing argument, it instead opted to simply disregard the improper citations.

While the trial court did not explicitly state its motivation behind that decision, it can reasonably be inferred that the trial court's decision was made with the purpose of avoiding unnecessary delay in the resolution of the case. As such, the trial court did not abuse its discretion when it denied Brian's motion to strike.

¶ 67                                      III. CONCLUSION

¶ 68    For the reasons stated, we affirm the judgment of the Du Page County circuit court.

¶ 69    Affirmed.