2020 IL App (2d) 190783-U
No. 2-19-0783
Order filed December 8, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF BLAIR WAITE, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 12-D-1254 |
| | ) | |
| DIANE BENNER, | ) | Honorable |
| | ) | Charles W. Smith, |
| Respondent-Appellee. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Presiding Justice Bridges and Justice Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's finding that husband failed to prove a substantial change in circumstances warranting a decrease in his child-support obligation was not against the manifest weight of the evidence.

¶ 2                                    I. INTRODUCTION

¶ 3    In 2013, the circuit court of Lake County dissolved the marriage of Blair Waite and Diane Benner. Pursuant to the settlement agreements incorporated into the judgment of dissolution, the parties shared joint custody of the two minor children with a 50/50 parenting schedule and Blair agreed to pay $2600 a month in child support. In 2018, Blair filed a motion seeking to decrease

his child support obligation which was denied by the circuit court. Blair appealed. For the reasons that follow, we affirm.

¶ 4                                  II. BACKGROUND

¶ 5                              A. Dissolution Proceedings

¶ 6     Blair and Diane were married in Indiana on April 24, 2004. Two children were born to the parties, neither of whom has yet reached the age of emancipation. Blair filed a petition for dissolution of marriage on June 27, 2012. On August 23, 2013, the trial court entered a judgment for dissolution of marriage which incorporated the parties' Joint Parenting Agreement (JPA) and Marital Settlement Agreement (MSA).

¶ 7     Pursuant to the JPA, the parties agreed to follow a 50/50 shared parenting schedule where the children, ages seven and ten at the time of the divorce, would spend alternating weeks with each parent during the school year and a similarly equal division of time during the summer months. This equal sharing of parenting time was agreed upon to secure the maximum involvement and cooperation of both parents in the lives of the children.

¶ 8     Regarding child support, Blair agreed to pay Diane the sum of $2600 each month. The MSA provided:

> "The parties acknowledge that the child support of $2,600 per month as recommended by
> the court and accepted by the parties is based upon the totality of the present circumstances
> including, but not limited to the fact that Blair Waite's salary (excluding bonus) is about
> $214,000 per year and Diane Benner's current salary (excluding bonus) is about $66,000
> per year and rental income based on the 2012 tax return and her representation that she no
> longer has any employment in Indiana."

Further, Blair was obligated to pay Diane 28% of net bonuses he received less 28% of any net Bonuses Diane would receive. The parties also agreed to share the cost of extracurricular activities, required school fees, and uncovered medical expenses on a percentage basis, Blair 55% and Diane 45%.

¶ 9 At the prove-up, the judge noted that the shared parenting schedule made this an unusual situation; therefore, the amount of child support represented a downward deviation from the 28% guideline for two children. The $2600 amount was reached via negotiations considering that the parties would have equal time with the children. The calculations were explained further by Blair's testimony at the prove-up:

"[MR. REID (BLAIR'S ATTORNEY)] Q. Okay. Under the terms of this agreement, you're going to pay child support in the amount specified in the agreement. And as you know, we pre-tried that issue with Judge Ukena and this was his recommendation as to the child support amount.

A. Yes.

Q. And you understand there really is no guideline for this situation because you have a 50/50 parenting schedule.

A. I understand.

THE COURT: So you're asking for a downward deviation in child support, counsel? Does he have income?

MR. REID: He does.

* * *

MR. REID: If it would be helpful, your Honor, I could ask a couple of additional questions on that.

THE COURT: That would be helpful.

BY MR. REID:

Q. So we did some calculations. And the number that we had come up with was that if you had been paying 28 percent of your net income to Diane for child support, less 28 percent of her net income, given the 50/50 parenting schedule, that we were coming up with a figure in the vicinity of $1800 a month. [Diane's attorney] had some slightly different inputs and was coming up with a figure of about $2,000 per month. Is that correct?

A. That's correct.

Q. And you understand that Judge Ukena made a recommendation at the higher figure set forth in the document based upon the totality of the circumstances.

A. Yes, I understand.

THE COURT: Okay. Thank you for that clarification. And much of it is outlined in [the MSA] regarding child support. Because it looks like we had a bit of an unusual situation here. And I appreciate you confirming that for me."

¶ 10    In the MSA, the parties acknowledged their obligations to contribute towards the post-high school education of the children and noted that there are college savings accounts for the two children with approximate values of $66,355 and $36,267.

¶ 11    The "Property Settlement" section of the MSA divided the parties' various accounts and assets. Diane was allocated a residence located in Indiana held in her name, her 2002 Subaru Outback, all retirement and other accounts held in her name, certain personal property, and $155,000 from Blair's Rollover IRA account. The accounts listed in the MSA allocated to Diane (including the IRA rollover) totaled approximately $263,406. Blair was allocated the former

marital residence in Lake Bluff, Illinois, his 2007 Toyota Prius, all retirement and other accounts held in his name, and personal property. The accounts listed in the MSA allocated to Blair totaled approximately $445,738. The property settlement portion of the MSA also provided for Blair to receive "all Baxter-related benefits (cash, vested RSU's [restricted stock units] and vested stock options) held in the ETrade account, subject to his duty to make a [$15,000] contribution towards Diane's attorney fees and costs . . . . Blair shall also retain his unvested stock options and unvested RSU's at Baxter." No value was listed in the MSA for these assets. Both parties waived maintenance.

¶ 12                    B. Proceedings on the Motion to Decrease Child Support

¶ 13    On May 10, 2018, Blair filed a motion to decrease child support. He argued that his recent changes in employment resulted in a decrease in his overall compensation. He also argued that Diane had enjoyed an increase in income since the divorce. As a result, Blair asserted that there was a substantial change in circumstances warranting a decrease in his support obligation for their children, ages 15 and 12 at the time. He filed an amended motion on December 14, 2018, to disclose a subsequent job change and upward adjustment to his income. In support of his motion, he argued that the "totality of the circumstances" contemplated in the MSA included that the annual stock equity grant he received from his then employer be considered part of his income. He no longer receives this type of benefit with his new employer; thus, he no longer has vested stock options to rely upon as a component of his income. Furthermore, he contended that Diane's income had substantially increased over the prior six years. Given their 50/50 parenting schedule, he asserted that the 2017 revisions to section 505 of the Illinois Marriage and Dissolution of Marriage Act (Act), providing for a shared parenting adjustment when parties have equal, or nearly equal allocation of parenting time, should be applied to decrease his child-support obligation. See

750 ILCS 5/505(a)(3.8) (West 2018). After a three-day hearing, the trial court denied his motion finding no substantial change in circumstances. What follows is a review of the evidence presented at the hearing.

¶ 14     Blair testified that he began working at Baxter Healthcare as Global Marketing Director in 2010 and his compensation package included his salary; a Management Incentive Compensation Plan (annual bonus); a stock equity grant, one-third of which would vest each year over the following three years; and certain other benefits. Blair's Annual Compensation Review Summary for 2013/2014 showed his total compensation was valued at $388,652, which included his salary of $215,455.40; his bonus of $56,606.20; a stock equity grant of $73,500; and an estimated benefits value of $43,091. His compensation increased over the following four years. His Annual Compensation Review Summary for 2014/2015 valued his total compensation as $414,135, which included his salary of $221,919.06; his bonus of $74,332.11; a stock grant of $73,500; and an estimated benefits value of $44,384. For 2015/2016, his total compensation was valued at $421,870, which included: salary of $221,919.06; bonus of $81,109.20; stock equity grant of $68,600; and estimated benefits of $45,360. His Annual Compensation Review Summary for 2016/2017, his last year at Baxter, valued his total compensation at $446,446, listing his salary at $226,801.28; his bonus as $112,052.51; a stock equity grant of $59,600, and an estimated benefits value of $45,614.

¶ 15     Blair testified that the amounts for his salary and bonus would appear as listed on his income tax returns, but the amount for the stock grant would not. Those stock grants would vest over a three-year period beginning one year after they were granted, so any income that may appear on his tax returns would result from cashing in prior stock grants that had vested and this amount would vary depending upon how much he decided to cash out in a given year. He acknowledged

that part of the reason that he was allocated all of the vested and unvested Baxter stock options in the MSA was because it would have been difficult to differentiate the value of those stock options once they combined with stock awards granted to him by Baxter post-dissolution. Blair explained further that the amount for other estimated benefits is not actually received as income but is how Baxter placed a value to employee healthcare and other similar benefits.

¶ 16    Blair's W-2 income listed on his federal income tax returns was as follows: $296,924 in 2013; $333,479 in 2014; $321,789 in 2015; $493,688 in 2016; and $427,660 in 2017.

¶ 17    In June 2017, Blair's employment at Baxter was terminated through no fault of his own. Upon learning that his position at Baxter was being eliminated, Blair began cashing out his vested stock options to avoid losing them. This resulted in the significant income increases in 2016 and 2017 as reflected in his W-2 income.

¶ 18    Six months after leaving Baxter, Blair briefly worked at Vyaire as a director of marketing for a salary of $210,000 and a $15,000 signing bonus. He explained that he elected to leave that job because of an unsatisfactory working environment. In September 2018, Blair accepted a position as associate director of marketing at Astellas where he earned a base salary of $219,000; a signing bonus of $60,000, paid in two $30,000 installments; a target bonus capped at 23% of his base salary or $50,370; and participation in a Performance Incentive Plan (Astellas PIP). Blair testified that the Astellas PIP vests over three years but did not think it would be comparable to the stock options offered at Baxter. Astella's offer letter to Blair describes it as a "long term incentive plan."

¶ 19    Blair's W-2 income listed on his 2018 income tax return was $271,309.12. Blair estimated that his W-2 income for 2019 would be $274,185.

¶ 20    Blair testified that he has taken his daughters on numerous domestic and international trips over the past several years and has become well versed in finding online discounts to make the trips more economical.  They drive to Ontario, Canada, to visit family twice a year and usually stay with family rather than in hotels.   In 2015, they took an additional Canadian trip to Calgary and the Banff area.  In 2017, they went to Montreal and Quebec City.  He has also taken the girls to Europe, including a trip to in 2014 or 2015 to Amsterdam and Paris and one to Croatia in 2018. When they are home, Blair testified he enjoys taking his daughters to movies and out for dinners. He often uses discount websites to defray the costs.

¶ 21    Blair still lives in the former marital residence which was built in 1961 and had not previously been updated.  He testified that he has made $100,000 in improvements, most notably remodeling the kitchen and bathrooms and doing some necessary landscaping repairs and improvements.  He paid for these improvements in cash.  In 2017 or 2018, he paid $50,000 towards the reduction of his mortgage.  The home is now valued at $514,000, and his mortgage is $148,244.

¶ 22     Blair purchased a Model 3 Tesla for which he pays $1021 per month.  He still owns his Toyota Prius for driving to Canada and for the anticipated use by his daughters when they begin driving. Blair's financial affidavit reveals that he contributes $2580 per month towards his retirement and his employer makes a 6% matching contribution.  The affidavit also shows that he established a 529 college savings account for someone named Matthew with a balance of $28,228 to which he contributes $400 each month.  He does not carry any long-term credit card debt.

¶ 23    Diane is a registered nurse with a master's degree in nursing education.  She received her degree in August 2012, during the pendency of the divorce proceedings. Pursuant to a temporary support order, she was directed to seek employment.  In July 2013, one month before the divorce judgment, Diane started a job with the Lake County Health Department as Assistant Program

Coordinator, earning $66,246 a year. At the time, she had also been offered a position at Medline Industries at $80,000 a year with a potential 20% bonus. She declined this job because it was a sales/marketing position, a field in which she had no experience, and with all of the changes occurring she believed she should focus on something "more in line with [her] skill set." Diane decided to leave the Lake County position after one year because she did not have enough paid time off to accommodate her children's school schedule. She also wanted to be available for her daughter who had to have surgery. After a period of unemployment, Diane began working as a lactation consultant at Franciscan Alliance in Crown Point, Indiana for $47,000 per year. For two years, she worked around the parenting schedule, which was slightly modified by agreement from Friday to Thursday exchange days, working in Indiana and then having her parenting time in Illinois on alternating weeks.

¶ 24    In 2016, Diane began working as a lactation consultant at Northwest Community Hospital and still worked there as of the time of the hearing. She is considered a full-time employee and works 30 hours per week. In 2018, Diane's gross income from Northwest Community was $78,555.47. In 2018, she took a second part-time job with New Mother New Baby, a private entity that contracts with Northwestern Hospital, earning $12,308.50. With her two jobs, her total gross income for 2018 was $90,863.97. [1] Diane testified that her position as a lactation consultant

---

[1]    The trial court hearing also included consideration of Blair's motion for sanctions against Diane for numerous omissions and inaccuracies in her financial disclosures. The court found Diane had intentionally and recklessly filed inaccurate and misleading financial affidavits and ordered her to pay $5000 in attorney fees and $2500 in sanctions. Blair discusses these matters at length in his brief. However, because neither party appealed this ruling, this court will not address the

for New Mother New Baby is "contract work for two years, and there is no guarantee as far as the hours." She typically works one or two days each week in two- to eight-hour shifts, depending upon the need and her ability to work around her schedule at Northwest Community Hospital.

¶ 25    Diane testified that she moved numerous times in the years after the divorce with the goal of staying near the children's schools. From March 2013 until August 2015, Diane rented a four-bedroom, single-family home in Lake Bluff, Illinois, about four blocks from the girls' school and a mile from Blair's home. She had to move because the owners decided to sell the property and she determined that she was financially unable to purchase it. She then moved into a two-bedroom apartment for one year in downtown Lake Bluff because she was unemployed for a period of time and this was all she could afford. Over the following two years, Diane lived in two different rental properties until she purchased her current residence in Lake Forest in August 2018. Her last rental property was a two-bedroom duplex with a small study area that she used as a bedroom where she paid $1350 a month in rent. She now owns a three-bedroom home just a few blocks away from the girls' schools. Her home was built in 1956, she testified that she has done some painting, but the house does need updating. Diane's monthly mortgage payment is $2709 and includes property taxes and private mortgage insurance.

¶ 26    Pursuant to the MSA, Diane was allocated the Indiana residence which she had purchased before the marriage in 1993 but was identified as marital property in the MSA. She sold that home in May 2015 for $273,280 and deposited the funds into an Edward Jones account jointly held by her and her mother. During this time, she also purchased a house in Munster, Indiana for $140,000. Diane testified that the money in the Edward Jones account became her mother's money because

---

facts and findings that do not relate to the issue of modification of support.

her mother had loaned her a substantial amount prior to and during the divorce, including $25,000 for the down payment when she originally purchased the house in 1993; $95,000 borrowed while going through the divorce; and $9000 borrowed to secure her Lake Bluff rental home. However, Diane acknowledged that she made withdrawals from the account to transfer funds to herself, to pay the mortgage on the Munster house, to pay her attorney fees, for the down payment on her Lake Forest home; to lease a new Subaru Forester; and for other associated expenses. She maintained that this was her mother's money, and she intended to pay it back. Later in her testimony, Diane stated that none of the expenses paid from that account created any new debt to her mother.

¶ 27     Diane testified that when the children are with her, they dine out quite often because of her work hours. They enjoy "girly" activities like going to nail salons, shopping, and having the girls' friends over. Diane has also taken the girls on vacations. Most recently in June 2018, they went to Iceland, Paris and Rome. She has taken the children on a number of domestic trips, including Florida and other locations associated with one of the girls' extracurricular activities.

¶ 28     In addition to the Subaru Forester that she currently leases, Diane still owns the Subaru Outback for her daughters to drive when they are licensed. She testified that she has approximately $29,000 in credit card debt, which is more than she normally carries and most of which she attributes to attorney fees.

¶ 29                    C. The Trial Court's Decision

¶ 30     After hearing the evidence, the trial court ruled that no substantial change in circumstances had occurred to warrant modification of Blair's child-support obligation. The court found Blair's testimony credible that he would not be receiving stock options from his new employer. However, the court noted that "the fact remains that his child support was calculated on his base salary which

is slightly higher with his new employer than it was at Baxter." The court further noted that Blair was never obligated to pay child support based on income from his stock options, thus his child support should not be decreased because he no longer receives the stock options. The court assessed that Blair's petition was a "rather transparent attempt to have his child support calculated on the new income shares statute" instead of the law in effect at the time of the divorce. Referring to in *In re Marriage of Salvatore*, 2019 IL App (2d) 180425 and *In re Marriage of Mulry*, 314 Ill App. 3d 756 (2000), the court found that Blair's petition for modification was filed after the amendment to the Act; therefore, "[Diane's] income is not a [sic] relevant to the support calculations agreed to by the parties and incorporated into the [MSA] which this court has an affirmative obligation to enforce."

¶ 31    As further support for its decision to deny modification of support, the court cited *In re Marriage of Verhines & Hickney*, 2018 IL App (2d) 171034, ¶ 81, which directs courts to take a "holistic view of the parent's financial position and consider all financial resources, including assets and even the financial status of a new spouse." The court reviewed the relative financial situations of Blair and Diane, the fact that the children are now 16 and 13, so Blair's obligation will be reduced in two years and eliminated in 5 years; that both parties acknowledge that the children's needs and expenses are increasing each year; and the fact that the parties continue to follow the 50/50 custody agreement and are responsible for the basic expenses of the children while with them. Noting that Blair was seeking to decrease his support obligation by 50% or more to either $1426.75 or $1097.50 per month, the court concluded that it "does not find that [Diane] can afford to maintain a home in the Lake Forest School District so that the children can continue to attend their current schools on her salary and the proposed reduced amount of support." The

court concluded "using the Verhines [sic] holistic approach, that the current support is appropriate and still affords Blair a comfortable lifestyle."

¶ 32                                   III. ANALYSIS

¶ 33    On appeal, Blair argues that the trial court erred in determining that no substantial change in circumstances occurred to justify a decrease in his child support obligation. In support, he contends that (1) his income derived from stock awards was part of the "totality of the circumstances" at the time of the divorce and the loss of that income constitutes a substantial change in circumstances and (2) Diane's increased income constituted a substantial change in circumstance to warrant a decrease in support.

¶ 34    The decision to grant or deny a motion to modify child support lies within the sound discretion of the trial court, and this court will not disturb the trial court's decision on appeal absent an abuse of that discretion. *In re Marriage of Heldebrandt*, 301 Ill. App. 3d 265, 267 (1998).   An abuse of discretion occurs when no reasonable person would take the view of the trial court. *In re Marriage of Pratt,* 2014 IL App (1st) 130465, ¶ 22.  Section 510(a)(1) of the Act provides that a child-support judgment can only be modified upon a showing of a "substantial change in circumstances."   750 ILCS 5/510(a)(1) (West 2018). The party seeking modification has the burden of showing that a substantial change in circumstances has occurred since entry of the original support order. *In re Marriage of Connelly*, 2020 IL App (3d) 180193, ¶ 13. "Courts are afforded wide latitude in determining whether a substantial change in circumstances has taken place." *Id.* (citing *In re Marriage of Saracco*, 2014 IL App (3d) 130741, ¶ 16.).  A trial court's finding that no substantial change of circumstances has occurred will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re Marriage of Barnard,* 283 Ill. App. 3d 366, 370 (1996).   A decision is against the manifest weight of the evidence only when an

opposite conclusion is clearly apparent or "when the court's findings appear to be unreasonable, arbitrary, or not based on evidence." *Verhines*, 2018 IL App (2d) 171034, ¶ 51.

¶ 35    Blair contends that the original child support award contemplated that his overall income included the stock options he received from Baxter, and now that he no longer receives those stock options, his overall income has decreased dramatically. In support, he points to the MSA which states the support award was based upon the "totality of the present circumstances including, but not limited to" the salary of both parties. He contends that the stock awards were always an "income source" that he relied upon and were considered part of the "totality of the circumstances" when the support award was set. Blair argues, that in 2013, the year of the divorce, he had been awarded $73,500 in stock options and continued receiving stock options every year he was employed by Baxter. Therefore, he purports his annual income has been reduced by as much as $73,500 since the time of the divorce now that he no longer works at Baxter.

¶ 36    To address this argument, we must take a step back for a closer look at the MSA in the context of the law in effect at the time. In 2013, when the trial court entered its child support award in this case, statutory child support guidelines followed a percentage of income model, requiring the noncustodial parent to pay a percentage of his or her net income to the custodial parent. See 750 ILCS 5/505(a)1 (West 2014). Under those guidelines, noncustodial parent with two children was presumptively required to pay 28% of his net income to the custodial parent unless the court expressly found reason to deviate from the guideline. *In re Marriage of Singleteary*, 293 Ill. App 3d 25, 36-37 (1997) (the trial court must make express findings when it orders child support that is below the statutory minimum). In situations where parents share equal parenting time, courts could disregard the statutory guidelines in the Act and instead consider the

factors listed in section 505 of the Act. *In re Marriage of Steadman,* 283 Ill. App. 3d 703, 708 (1996).

¶ 37    In this case, the record shows that the parties agreed to and the court approved a downward deviation from the guidelines in the original judgment of dissolution due to the 50/50 parenting schedule. The $2600 monthly amount was settled upon after extensive negotiations in a pretrial conference. The resulting settlement agreement was reached after consideration of the net salaries of both parties and the net of any bonuses received. Contrary to Blair's attorney's reference to "net income" at the prove-up, the settlement agreement clearly provides for consideration of the parties' net salaries, not net income.

¶ 38    At the prove -up, Blair's attorney explained the process by which they arrived at the agreed number. Blair's salary at the time was $214,000 a year, and Diane's was $66,000 per year. Blair's attorney calculated that 28% of Blair's net "income" minus 28% of Diane's was "in the vicinity of $1,800 a month." Blair's attorney indicated that his opposing counsel "had some slightly different inputs and was coming up with a figure of about $2,000 per month." A review of the math reveals that neither party contemplated inclusion of any income other than salaries when arriving at these proposed numbers. Blair's attorney acknowledged that the pretrial judge then made a recommendation of a higher amount of $2600, based upon the totality of the circumstances, which the parties ultimately agreed to.

¶ 39    Further support for the conclusion that Blair's stock options were not considered in the calculation of child support is the fact that all vested and unvested stock options were awarded as marital property to Blair. The MSA is otherwise silent regarding any future stock options Blair may have received.

¶ 40    Finally, Blair's contention that his income decreased by $73,500, which is the amount of

the stock option award the year of the divorce, is misleading. Blair goes into great detail discussing the figures listed in his Annual Compensation Reviews from Baxter and arriving at percentages in an effort to show how much his income has purportedly decreased since leaving Baxter. The impact of those stock options on his annual income was not, in fact, the dollar amount of the stock award. Blair testified that while the amount of his bonus and salary would appear listed on his income tax returns, the amount for the stock grants would not. Those stock grants would vest over a period of three years, and any income that appeared on his tax returns resulted from cashing in prior stock grants. This would include all of the stock options allocated to Blair in the property settlement of the MSA and any options awarded to him after the divorce. In his testimony, Blair acknowledged that part of the reason he was allocated all of the vested and unvested stock options in the MSA was because it would have been difficult to differentiate the value of those stock options once combined with stock awards granted to him by Baxter post-dissolution. Blair ultimately reaped the benefits of those stock options upon cashing them in during the last two years of his employment at Baxter.

¶ 41　We agree with the trial court's conclusion that salary, not total income, was the basis for the original support award. The record shows that Blair's salary is now $219,000 a year which is higher than the $214,000 it was when the parties agreed to the child-support order.

¶ 42　Blair also contends that the trial court erred in concluding that Diane's income was not relevant to the support calculations agreed to by the parties and incorporated into the MSA. While Diane's income was, in fact, relevant to the original support calculations as evinced by the language of the MSA, the trial court's finding to the contrary is not controlling on the issue before the court. Diane's income was one factor considered when the court decided to deviate from the child support guidelines in effect at the time of the original support order. Diane's income

remained one factor to consider when determining whether a substantial change in circumstances had occurred since then. Only *after* a substantial change in circumstances determination has been made does income become a controlling factor and the court then takes on the task of establishing a new child support amount. *Verhines,* 2018 IL App (2d) 171034, ¶ 81.

¶ 43    Not all changes in circumstances constitute a substantial change in circumstances to justify modification of child support. *Connelly*, 2020 Ill App (3d) 180193, ¶ 18. Furthermore, income is not the only measure of a parent's continued ability to pay child support when considering whether a substantial change has occurred. *Verhines,* 2018 IL App (2d) 171034 ¶ 81. "To determine whether there has been a substantial change in circumstances, the court should take a holistic view of the parent's financial position and consider all financial resources, including assets and even the financial status of a new spouse." Id. An increase in income of a parent receiving child support will not be considered a substantial change in circumstances when the increase is small compared to the supporting parent's income. *Connelly*, 2020 Il App (3d) 180193 ¶ 20.

¶ 44    In this case, despite his change in employment, Blair's income and lifestyle suggest that he has ample financial resources to continue to meet his support obligation at the level set in the MSA. His current salary is higher than it was at the time of the divorce. Cashing in his Baxter stock options resulted in a significant increase in his income to over $400,000 for two years. He made $100,000 in improvements to his home and a $50,000 payment toward the reduction of his mortgage. He purchased a second car, a Model 3 Tesla. He continues to save for his retirement each month in an amount comparable to his child support obligation. He has established a college fund for someone named Matthew, to which he contributes $400 each month. In his testimony, he described a very comfortable lifestyle providing numerous opportunities for domestic and international travel experiences for his children.

¶ 45    In the years since the divorce, Diane lived in four different rental properties with the goal of staying near her children's schools until she was able to purchase a home within the school district in 2018. She has had multiple jobs with fluctuating income until settling into her position with Northwest Community Hospital in 2016 where she earns $78,555 per year. Diane testified that she took on second job in 2018 to help make ends meet, earning an additional $12,308. Her income has, in fact, increased from the $66,000 she earned at the time of the divorce. Her increase in income allowed her to purchase a home in her children's school district in 2018 which supports the lifestyle the children are accustomed to and the logistics of the 50/50 parenting schedule with Blair. She testified that she has also provided travel opportunities for her children and has leased a second car so that her children, one of which is approaching driving age, will have a car to use.

¶ 46    The trial court found that Diane could not "afford to maintain a home in the Lake Forest School District so that the children can continue to attend their current schools on her salary and the proposed reduced amount of support." Although Diane's income has increased since entry of the divorce judgment, the increase, when considering all financial resources available Blair and Diane, the disparity in income between them, and the increased needs of the children, does not reasonably demonstrate a substantial change in circumstances warranting modification of child support. We conclude that the trial court's findings are supported by the manifest weight of the evidence; therefore, the court did not abuse its discretion in denying Blair's motion to decrease child support.

### III. CONCLUSION

¶ 47    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 48    Affirmed.